WINBURN, by Guardian *ad litem,* Appellant, v. STATE, Respondent.

*September 8—October 4, 1966.*

For the appellant there was a brief by *Francis R. Croak,* attorney, guardian *ad litem,* and *Grootemaat, Cook & Franke* and *David J. Hase* of counsel, all of

Milwaukee, and oral argument by *Mr. Croak* and *Mr. Hase.*

For the respondent the cause was argued by *Hugh R. Braun,* assistant corporation counsel of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, *William A. Platz,* assistant attorney general, and *Robert P. Russell,* corporation counsel.

HEFFERNAN, J.   The fundamental question presented in this appeal is whether insanity constitutes a defense to an allegation of juvenile delinquency. We face the additional question in this case, of whether the mental inquiry initiated by the juvenile judge was a sufficient determination of insanity.

The state argues that a juvenile-delinquency procedure is not a criminal prosecution but is merely the state's exercise of its duties *parens patriae* over children—and that the duty of the state is not to prosecute but "to bring them and their parents or guardians before an experienced and humane judge who shall inquire into the situation, not with the awe-inspiring and frigid methods of a criminal court, but informally and intimately, like a wise and gentle elder [Big?] brother, or like the good Samaritan of holy writ, and who shall, when fully advised, do that which is best for the child's future, either by way of sending it to an institution or by providing for kind and tactful but in no sense degrading surveillance for a limited time at home." *State v. Scholl* (1918), 167 Wis. 504, 509, 167 N. W. 830; and, accordingly, the armor of "rights" that can be donned by a defendant in a criminal case is not available to the alleged delinquent. There is much to support this point of view. Our statutes clearly point out that the judicial determination of juvenile delinquency is not a criminal conviction. This court has frequently reiterated this point of view. *State v. Scholl, supra,* 167 Wis. 504, 167 N. W. 830; *In re Fish* (1945), 246 Wis. 474, 17 N. W. (2d) 558.

· The entire philosophy of the Children's Code is avowedly the antithesis of criminal prosecution.

"For the delinquent child, the aim of the court is to correct, re-educate, re-direct, and rehabilitate, rather than to punish or to seek retribution for misdeeds." Wisconsin Handbook for Juvenile Court Services (November, 1959), p. 2.

The juvenile law is not to be administered as a criminal statute, and the rules of criminal procedure are not to be engrafted upon the Children's Code. *In re Alley* (1921), 174 Wis. 85, 90, 182 N. W. 360; *State v. Zirbel* (1920), 171 Wis. 498, 499, 177 N. W. 601. *State v. Scholl, supra,* pointed out that a child had no right to a trial by jury though the effect of the proceeding was to send him to an institution. There are many indications in the statutes that the framers of the act did not consider it a Criminal Code:

"48.01 (3) . . . The best interests of the child shall always be of paramount consideration . . . ."

"48.25 (1) . . . The presence of the child in court may be waived by the court at any stage of the proceeding." [1]

---

[1] "(1) *Juvenile Courts.* The procedure devised for juvenile courts is apt and enlightened. Nevertheless, the promoters of that legislation in their enthusiasm for its benefits and their determination to eliminate the conditions of the usual criminal court, have gone to the borderline of prudence in their iconoclasm. In the most advanced type of statute, the orthodox rules of trial evidence have been riddled as with a reformative machine-gun. The record of conviction in such a court can never be used elsewhere . . . . The record of moral delinquencies can be examined and used for determining his present guilt . . . . The hearsay reports of probation officers and others can be used without calling them to be examined . . . . The courtroom may be closed and the hearing held in private . . . . The party may be subjected to a physical and mental examination . . . . The child may be compelled to answer as to his own crimes, past and present . . . . And, finally, the *testimony can be heard in the child's absence.*

"The purpose has been thoroughly attained. And for all of these measures a good deal can be said,—for some of them, every-

"48.25 (3) . . . customary rules of evidence applied to issues of fact in civil trials shall be followed. The finding of fact shall rest on the preponderance of evidence . . . ."

"48.25 (6) . . . If any child or his parents desire counsel but are unable to employ it, the court in its discretion may appoint counsel to represent them. . . ."

"48.38 (1) No adjudication upon the status of any child in the jurisdiction of the juvenile court shall operate to impose any of the civil disabilities ordinarily imposed by conviction, nor shall any such child be deemed a criminal by reason of such adjudication, nor shall such adjudication be deemed a conviction."

The burden of the state's argument then is that, since this is not a criminal action, the child is not entitled to the usual safeguards of the criminal law. The validity of this position has long been questioned. While the avowed purpose of the Children's Code is that "the best interests of the child shall always be of paramount consideration," there is doubt that the strictly civil approach to the problem accomplishes that purpose. This was recognized by the child welfare committee of the Wisconsin legislative council, which in its 1955 report to the legislature said that "There has been criticism that in certain areas, because the juvenile court does not follow traditional procedures, the rights of the child are diminished rather than increased." (vol. 4, part 1, p. 30.) A recent commentary on our juvenile court system by Professor Joel F. Handler of the University of Wisconsin

---

thing. But the last-mentioned one—hearing the testimony in the party's absence—goes clearly over the borderline of prudence. A technical enforcement of the orthodox rule for every detail of the proof need not be urged. But that the judge should have the *power* to commit to long detention any person without giving the person *any opportunity to hear the substance of the testimony against him,* is fundamentally unsound and practically dangerous. That provision should be eliminated from those statutes, and no judge in practice should allow himself to employ it." 5 Wigmore, Evidence (3d ed.), p. 145, sec. 1400.

Law School reported criticism that our juvenile courts on a nationwide basis represented "unfettered official discretion." He pointed out that ". . . the system allows intervention by the government into the affairs of people without their consent and without standards and controls." Handler, The Juvenile Court and the Adversary System, 1965 Wisconsin Law Review, 7.

The supreme court of the United States in *Kent v. United States* (1966), 383 U. S. 541, 554, 86 Sup. Ct. 1045, 16 L. Ed. (2d) 84, recognized the *parens patriae* theory of juvenile rehabilitation, but went on to recognize the abuses that arise almost inherently from that philosophy:

"1. . . . The state is *parens patriae* rather than prosecuting attorney and judge. But the admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness.

"2. Because the state is supposed to proceed in respect of the child proceeding as *parens patriae* and not as adversary, courts have relied on the premise that the proceedings are 'civil' in nature and not criminal, and have asserted that the child cannot complain of the deprivation of important rights available in criminal cases. It has been asserted that he can claim only the fundamental due process right to fair treatment. For example, it has been held that he is not entitled to bail; to indictment by grand jury; to a speedy and public trial; to trial by jury; to immunity against self-incrimination; to confrontation of his accusers; and in some jurisdictions (but not in the District of Columbia, see *Shioutakon v. District of Columbia*, 98 U. S. App. D. C. 371, 236 F2d 666 (1956), and *Black v. United States, supra*) that he is not entitled to counsel.

"While there can be no doubt of the original laudable purpose of juvenile courts, studies and critiques in recent years raise serious questions as to whether actual performance measures well enough against theoretical purpose to make tolerable the immunity of the process from the reach of constitutional guaranties applicable to adults. There is much evidence that some juvenile courts, including that of the District of Columbia, lack the personnel, facilities and techniques to perform ade-

quately as representatives of the State in a *parens patriae* capacity, at least with respect to children charged with law violation. There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children."

The United States supreme court did not take upon itself the burden of dealing with each issue that it raised, but it did decide specifically in *Kent* that a child was entitled to counsel as a matter of right at the "critically important" hearing on the waiver of the juvenile court's jurisdiction in favor of the United States district court. In a broader sense, the supreme court, though concluding that the juvenile hearing in question need not conform with all of the requirements of a criminal trial or even of the usual administrative hearing, stated (p. 562), "we do hold that the hearing must measure up to the *essentials of due process and fair treatment.*" (Emphasis supplied.)

The philosophy behind the juvenile act is rehabilitation and treatment, but what may appear to a juvenile worker or judge as treatment may look like punishment to the juvenile. Irrespective of what we call the juvenile procedure, and no matter how benign and well-intended the judge who administers the system, the juvenile procedures, to some degree at least, smack of "crime and punishment." While the primary statutory goal is the best interest of the child, that interest is, as it should be, conditioned by the consideration of "the interest of the public." Sec. 48.01 (3), Stats. The interest of the public is served not only by rehabilitating juveniles when that is possible, but the interest of the public is also served by removing some juveniles from environments where they are likely to harm their fellow citizens. Retribution, in practice, plays a role in the function of the juvenile court. The judgments of juvenile courts do serve as deterrents to the conduct of at least a segment of our

juvenile society, not because those juveniles fear rehabilitation, but because they fear incarceration and punishment. Despite all protestations to the contrary, the adjudication of delinquency carries with it a social stigma. This court can take judicial notice that in common parlance "juvenile delinquent" is a term of opprobrium and it is not society's accolade bestowed on the successfully rehabilitated. It is common knowledge also that juvenile records do not, in fact, have a confidential status. Peace officers' records may be communicated to school authorities and to other law-enforcement agencies. The federal bureau of investigation has no difficulty in ascertaining whether an individual has a juvenile record. A juvenile record may be a substantial handicap to one who seeks employment with the United States government. The confidentiality of records, even if kept inviolate, is no real safeguard to the ex-delinquent for, if asked whether he was ever so adjudged, he will be morally obliged to admit it whether or not that status was adjudicated by due process and fair play. Professor Handler points out:

"These then are some of the consequences of an adjudication of delinquency . . . . It is true that perhaps in many cases the consequences may not be severe but may even be beneficial. This, however, is beside the point. All that need be recognized is that the consequences are potentially very harsh. There exists the power to take an adolescent from his home and confine him in what amounts to a prison. He will carry the stigma of criminal conviction which may penalize him throughout his life." The Juvenile Court and the Adversary System, 1965 Wisconsin Law Review, 7, 14.

The juvenile may be worse off than merely stigmatized. The adjudication of the rehabilitation status of delinquency may send him to the state prison.

". . . while a suspected juvenile offender is not accorded the full protection of traditional due process, this is offset by corresponding concessions by the state in the

best interests of the individual child. But after a juvenile is declared delinquent, this distinction may break down; the child, despite the lack of full constitutional protection, may be treated almost exactly as an adult offender.

"This occurs most dramatically when a child, placed in the custody of the state pursuant to an order of a juvenile court, is ultimately confined in an adult correctional institution . . . . a child may be committed by the court to a juvenile correctional system and subsequently transferred by administrative order to an adult institution; this is essentially the practice authorized in Wisconsin. Whatever the method used, however, the result is the same: a juvenile is placed in the adult correctional system without ever having been extended the full protection of an adult criminal trial." George E. Dix, Transfer of Juveniles to Adult Correctional Institutions, 1966 Wisconsin Law Review, 866, 869.

In view of the evident consequences of an adjudication of juvenile delinquency, it is difficult to accept the state's argument that the traditional concepts of "crime and punishment" have been eliminated. It is therefore apparent that the state's consequent argument that the "old concept of criminal responsibility" has no relevance is not completely acceptable if we are to accord to children at least some measure of the "essentials of due process and fair treatment."

Intent is a factor in the determination of juvenile delinquency in Wisconsin. In 1921 this court held that a boy was not to be found delinquent as the consequence of his having thrown a dynamite cap toward other children when "There is nothing to indicate that Arnold *intended* to do more than frighten his schoolmates." (Emphasis supplied.) *In re Alley* (1921), 174 Wis. 85, 92, 182 N. W. 360.[2]

We think it would be conceded that juvenile delinquency should not lie where the child's act is purely an

---

[2] In the same case the court, though recognizing the philosophy of *parens patriae* underlying the juvenile law, referred to the commitment to the boys school as "the infliction of such a penalty."

accident. As Holmes put it, "Even a dog distinguishes between being stumbled over and being kicked." Holmes, The Common Law (Belknap Press ed., 1963), p. 7.

It seems equally true that the juvenile court in its determination of delinquency should distinguish acts committed by the insane child from those committed by one not so afflicted. This concept, that it is unjust to "punish" the insane is rooted deep in our law. Mr. Justice THOMAS FAIRCHILD in *State v. Esser* (1962), 16 Wis. (2d) 567, 576, 115 N. W. (2d) 505, makes an exhaustive study of the historical basis for present-day concepts of insanity in the legal sense. He points out that in 1721, a treatise by William Hawkins says, "The guilt of offending against any law whatsoever, necessarily supposing a wilful disobedience, can never *justly* be imputed to those who are either incapable of understanding it, or of conforming themselves to it." (Emphasis supplied.)

The dispute over the proper tests of insanity that has so preoccupied the courts in recent times is essentially concerned with the question of fairness. Is it fair to convict of crime when the defendant, though knowing right from wrong, as the result of mental illness or incapacity, is unable to exercise the restraints upon his conduct that would enable him to conform to acceptable standards. It would seem incongruous that this great outpouring of concern should be lavished only upon adults who may be criminals while the children whom we profess to be particular objects of solicitude are bypassed. We conclude that the defense of insanity must be permitted in a juvenile delinquency procedure if those proceedings are to conform to the minimum *Kent* standards of due process and fair treatment.

The state, however, claims that intent is not required since only the fact that the boy did shoot his mother is necessary to "trigger" the finding of delinquency—that *mens rea* is irrelevant, that *actus rea* is all that need be

proved.[3] The state buttresses this argument by citing sec. 48.33, Stats., that provides for dismissal of the juvenile petition "if the court finds that the child is not within the jurisdiction of the court, or that the facts alleged in the petition have not been proved . . . ."

This state, however, has always taken the position that the mental condition is a matter of proof—a "fact" to be determined if challenged. It is an implied premise of every criminal complaint or juvenile petition that the accused is sane, but when that premise is challenged by evidence raising a reasonable doubt of the defendant's sanity, it becomes the obligation of the state (under *Esser*) to proceed to establish responsibility. " 'The state of a man's mind,' " said Lord Bowen in 1882, " 'is as much a fact as the state of his digestion.' " Prosser, Law of Torts (hornbook series, 3d ed.), p. 745, sec. 104. The juvenile petition was based upon the violation of sec. 940.01, Stats.—first-degree murder—that requires "intent to kill." A petition based on a violation that requires criminal intent cannot result in a finding of delinquency when the conduct was either unintended or when, because of insanity, there was a failure to form the requisite intent. Under the statute the juvenile judge had a clear right and duty to dismiss on the merits when the fact of insanity was proved by competent psychiatric testimony and that proof went unchallenged.

We also conclude that the procedure employed by the judge was not incorrect. He is specifically authorized (sec. 48.14 (3), Stats.), to have an alleged juvenile delinquent, who may be mentally ill, examined by the hearing procedure set forth in ch. 51. The record shows that the corporation counsel was present during the mental hearing and that he as well as the court and guardian *ad litem* questioned the medical witnesses. The examina-

[3] See Westbrook, Mens Rea in the Juvenile Court, University of Louisville Journal of Family Law, Vol. 5, No. 2 (1965), 121.

tion included not only the question of the boy's mental condition at the time of hearing but also at the time he shot his mother. The opinion of the court clearly points out that the court not only considered the child mentally ill and therefore subject to commitment to the Winnebago State Hospital but insane under the legal definitions of *Esser*.

The state concedes that if the child is not presently sane he cannot presently be "tried" as a delinquent. It contends that though insanity should exonerate the child from the responsibility of presently defending himself it should not exonerate him from criminal responsibility for acts committed while insane. Without dwelling on the obviously inconsistent philosophy that underlies these positions, it does appear that the solution proposed by the state—to leave the petition for delinquency pending —hardly serves the paramount interest of the child—or of society. The state would conclude that, in the event that some years hence the child regains his mental health to the extent that he can stand trial, he should then be charged as a juvenile delinquent although the *actus rea* was the result of insanity, and although the child, when finally tried, has been thoroughly rehabilitated and restored to mental health. This hardly seems consonant with the avowed purpose of the law. The state also leaves open the possibility that, should recovery occur after the age of eighteen, and assuming (without deciding) [4] that the juvenile court has lost jurisdiction, the state would then proceed to prosecute criminally a person who as a child allegedly committed first-degree murder. Could the child then in the criminal courts be able to raise the defense that was denied to it in the juvenile court? This would hardly be consistent with the avowed policy of showing special solicitude for the child in a juvenile court. The state in its brief asserts that it "wants the opportunity to prove delinquency even in the face of a

---

[4] See *Kent v. United States, supra*.

strong defense of insanity." This hardly squares with the original benevolent *parens patriae* concept of the juvenile law.

The juvenile court judge by his finding has preserved a fundamental right—the right not to answer criminally for misdeeds committed under the influence of an insane mind. To hold otherwise would be inconsistent with the *Kent* insistence of fair play. He has by the commitment of the child to a state hospital for rehabilitation and treatment taken the first step to carry out the purpose that the juvenile law is designed to serve—the interest of the child. By that commitment, the additional and extremely important purpose of protecting the interests of the public is also accomplished. Under the conditions of the commitment, the child cannot be released until it appears safe for him and society. Under the provisions of the Juvenile Code, sec. 48.39, Stats., the dismissal on the merits by reason of insanity is a bar to future criminal prosecution. Accordingly, if the child is restored to health by hospitalization, he can return to society without the possibility of further juvenile or criminal procedures. The action of the county judge effectively implements the legislative purpose.

The order of the circuit court must be reversed, and the order of the children's court dismissing the delinquency petition is reinstated.

*By the Court.*—Order reversed.