STATE OF NEW JERSEY IN THE INTEREST OF H. C.

Juvenile and Domestic Relations Court
Morris County

June 17, 1969.

584

Mr. *Charles M. Egan, Jr.,* Morris County Prosecutor, for the State.

Mr. *Edward F. Broderick, Jr.,* for the juvenile.

Mrs. *Marcia R. Richman,* Deputy Public Defender (Mr. *Stanley C. Van Ness,* Public Defender, attorney), *amicus curiae.*

POLOW, J. J. & D. R. C. On November 29, 1968 the bodies of two young girls, six and seven years of age, were found lying in the woods behind the homes on Chestnut Terrace in Rockaway Township. Both had been severely beaten with blunt objects which had crushed their skulls. There were knife wounds in the body of one. The next day, H. C., a 15-year-old juvenile was apprehended and charged with delinquency for the killing of the two girls.

The factual testimony taken at the original hearing on February 19, 1969 makes it clear beyond question that H. C. did in fact strike the blows which resulted in the girls' deaths. The proofs included State Police laboratory analyses of blood samples from the accused boy's clothing and from the girls, and the statement of the juvenile to the

police (taken with consent of his father under circumstances assuring voluntariness and truthfulness). The juvenile admitted striking the blows and described the circumstances in his statement. The circumstances were related by the juvenile in greater detail to defense psychiatrists, who included those details in their testimony. After committing the acts the boy had left the girls lying where they had fallen in the woods, went home, spoke to his mother in a normal manner, removed his blood-stained clothing, ate with the family, watched T-V and went to bed. His parents noted nothing unusual.

Since the factual evidence was substantially uncontested, most of the hearing consisted of testimony by three psychiatrists, one produced by the State and two by the defense. All are preeminent in their field and their testimony is substantially consistent.

Dr. Henry A. Davidson, called by the prosecutor, had examined the boy at the Morris County Youth Center. The examination was in the form of an interview for about an hour and a quarter. There was no discussion concerning the offense charged since the boy indicated he had been instructed not to say anything about it. In other respects, the boy was cooperative.

Dr. Davidson concluded that H. C. is a schizophrenic. He described the juvenile as "curiously apathetic considering the predicament he knew he was in." With no plans for the future and no hobbies he seemed to Dr. Davidson to be alienated from others his age and to display a curious lack of emotional interest in his predicament. He also displayed a feeling that he has enemies and that there are unfriendly forces around him. Dr. Davidson noted no hallucinations but described the general pattern as that of early schizophrenia.

With regard to the ability to know and understand fully the nature and consequences of his actions, Dr. Davidson concluded that the boy had such ability in the "simple

rational sense" as distinguished from the capacity to "grasp, appraise, to evaluate, to appreciate." With regard to the latter, Dr. Davidson found H. C.'s ability to control his actions, to prevent acting upon impulse and to appreciate consequences, to be impaired.

During cross-examination Dr. Davidson testified that of five categories of mental disease, including psychosis, psychoneurosis, behavioral disorder, psychosomatic disorder and mental retardation, psychosis is furthest from the center. He also classified schizophrenia as a psychosis.

Drs. Irving Markowitz and Alvin Friedland testified for the defense. They had examined the boy together on December 18, 1968 at the Morris County Youth Center. Both concluded that H. C. suffered from schizophrenia.

Dr. Markowitz testified that the boy was cooperative during the examination but extermely withdrawn, displaying an "almost pathological absence of any awareness of what we may do for him or do with him." However, he responded to questions freely and discussed the killings. He explained that after going into the woods to cool off by swinging on vines he was interrupted by the two young girls. According to Dr. Markowitz, H. C. reacted as if the girls were the kind of enemies he saw around him in his daily life. He once had beaten up a young boy and as a result of this, according to H. C., friends of the boy constantly picked on him and called him obscene names. He dwelt on this and became preoccupied with it. He described noises in his head and said he heard voices which he associated with his enemies. These voices to some extent compelled him to hit these two young girls.

Dr. Markowitz concluded that H. C. has many of the classic symptoms of schizophrenia. He felt that the juvenile would fit the category of paranoid schizophrenia because of his suspiciousness, his constant alertness to injury, the wariness with which he moves about and his constant preoccupation with avoiding ridicule and with staying away

from possible enemies. However, since he considers paranoid schizophrenia generally as an adult classification, Dr. Markowitz stated that H. C. would more properly fall within the sociopathic schizophrenia classification. He gave the view that H. C. suffered from chronic schizophrenia, a condition already of some duration and likely to continue.

Dr. Markowitz did find evidence of hallucinations in the juvenile's mention of noises in his head and of hearing the voices of his enemies. According to this psychiatrist, H. C. is not capable of trying to fabricate this information, for he seemed not only unconcerned about self-incrimination but in fact pathologically unconcerned.

In Dr. Markowitz's opinion, H. C. was not capable either of differentiating right from wrong or of knowing the nature and quality of his acts. He stated that the prognosis is poor and that the likelihood of bringing H. C. back to reality is remote. On cross-examination, the doctor indicated that the boy does understand the proceedings and the nature of the charge, although not the enormity of it. He also noted that very few institutions exist which would treat a youngster of this kind.

Dr. Friedland, whose practice in psychiatry primarily deals with children and adolescents, concluded that the juvenile had impaired concepts of himself in relationship with others. He recognized some intellectual memory disturbances, secondary psychopathological memory disturbances and signs of a perceptual disorder involving auditory hallucinations. The boy was apathetic, flat, tense and would occasionally shudder, the last indicating some nervous system disfunctions.

Dr. Friedland recalled how the boy described the afternoon of the killings. At three o'clock he went into the woods to check his vines. He used the vines to swing on in order to cool himself off because he came home overheated. He carried a knife to cut the vines and he would tie them up where they were safe from other children. On this particular

day some vines had been untied and hung down. He was annoyed that someone had tampered with them when he saw the girls. He thought they were laughing at him. He was always concerned about people laughing at him. He also felt that the girls were calling him obscene names. He became very upset, picked up a rock and hit the girls. He did not demonstrate remorse at any time during the interview.

Dr. Friedland's specific diagnosis was adolescent schizophrenia, paranoid type. To the basic inquiry concerning whether H. C. was capable of knowing right from wrong, the doctor responded that under stress the boy lost his ability to regulate and control his instinctive drives and to handle his anxieties. He gave his prognosis as poor.

The prosecutor and defense counsel agreed to an inpatient diagnostic evaluation of the boy at Menlo Park prior to a decision on adjudication. Accordingly, the boy was committed for a period not to exceed 90 days for this purpose, and the hearing adjourned until after completion of the evalution. Counsel were instructed to file briefs on the legal questions involved in the case and the public defender was invited to appear *amicus curiae*. Menlo Park's findings, made available to both sides, are not inconsistent with the testimony of the three psychiatrists. The "Diagnostic Synthesis" and "Recommendation" in the report from Menlo contain the following statements of particular significance to this court:

"DIAGNOSTIC SYNTHESIS:
 \* \* \*

It is quite obvious that the alleged murders were committed under the influence of voices in a state of dissociation and unrealistic thinking \* \* \*.

 \* \* \*

\* \* \* The boy's schizophrenia is definite and he should be considered psychotic and in need of psychiatric attention."

"RECOMMENDATION:

In essence, he belongs in a mental hospital, but since their resources of treatment are limited and patients are at times discharged prematurely, correctional placement seems to be the only alternative.

The staff recommends the Youth Reception and Correction Center, Yardville."

The basic question before the court concerns the effect of the psychiatric testimony and the Menlo evaluation upon the adjudicatory phase of the proceeding in the first instance, and upon the dispositionary phase if there is an adjudication of delinquency.

Counsel for the defense urges that the juvenile now before the court was laboring under such a defect of reason from a disease of the mind as not to know the nature and quality of the act he was doing and therefore was insane under the *M'Naghten* rule. He further contends that insanity is a defense to a charge of delinquency, a contention with which both the prosecutor and the public defender agree.

## I

██ Although insanity is a term applied with different meanings for different purposes, it has achieved a specific definition as a defense to prosecution for commission of a crime. For that purpose it must be proved that the accused, at the time of committing the act, was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, he did not know what he was doing was wrong. *State v. Lucas*, 30 *N. J.* 37 (1959); *Aponte v. State*, 30 *N. J.* 441, 450 (1959). This rule is familiarly known as the *M'Naghten* rule, first adopted in New Jersey in 1846 in *State v. Spencer*, 21 *N. J. L.* 196 (*O. & T.* 1846), and reiterated periodically thereafter on numerous occasions. See *State v. Lucas, supra*, 30 *N. J.*, at *p.* 68.

The psychiatric evidence lends strong support to the defense contention that the requirements of the *M'Naghten* rule have been met. Though the prosecutor argues to the contrary, I am satisfied that such evidence in the trial of an adult charged with an indictable offense would support

the factual conclusion that the accused, at the time of the act, suffered from such a disease of the mind as would be a complete defense to the adult criminal charge under *M'Naghten*[1].

## II

The issue, then, is whether and to what extent the defense of insanity under the *M'Naghten* rule applies in the juvenile court. I find that it does not bar an adjudication of delinquency. (On the other hand, I also find that such insanity does bar the imposition of penal sanctions and I so hold for the reasons stated in III below.)

There is no reported decision in New Jersey which deals with the question. As defense counsel points out, however, the decision of the United States Supreme Court in *In re Gault*, 387 *U. S.* 1, 87 *S. Ct.* 1428, 18 *L. Ed. 2d* 527 (1967), does require that constitutional safeguards of a criminal trial be applied to juvenile court proceedings in a matter of this seriousness. In this connection, New Jersey has held, since *Gault*, that the criminal court rules concerning suppression of evidence apply in a juvenile proceeding. *State v. Lowry*, 95 *N. J. Super.* 307 (*Law Div.* 1967) ; *State in the Interest of L. B.*, 99 *N. J. Super.* 589 (*Juv. & D. R. Ct.*

---

[1] The boy's ability to participate in the proceedings has not been questioned, and the testimony supports the conclusion that he understands both the charge and the nature of the proceedings at least sufficiently well to permit him to comprehend his position and consult intelligently with counsel in the preparation of his defense. This accords with the test applied by our criminal courts for the ability to stand trial. *State v. Coleman*, 46 *N. J.* 16, 40 (1965). Furthermore the ability to stand trial may exist notwithstanding the fact that as here, the boy unquestionably still suffers from such a mental disorder as to require institutionalization, at least for the present and immediate future.

"It is well recognized that an accused may have a mental disorder but may nevertheless understand his position and be able to assist fully in his own defense * * *" *State v. Coleman, supra*, 46 *N. J.*, at p. 40.

1968). Our Supreme Court, even prior to *Gault,* had set aside convictions in a juvenile homicide case which were based upon confessions obtained under circumstances not measuring up to "the essentials of due process and fair treatment." *State in the Interest of Carlo,* 48 *N. J.* 224 (1966).

Furthermore, a juvenile 16 years of age or older, accused of a criminal type of offense, may not be transferred to criminal court jurisdiction, even where authorized by law, without the benefit of counsel at a special waiver hearing. *Kent v. United States,* 383 *U. S.* 541, 86 *S. Ct.* 1045, 16 *L. Ed. 2d* 84 (1966); see also *State v. Tuddles,* 38 *N. J.* 565 (1962). Even within the juvenile process itself, in any case where the consequence may be commitment to an institution and curtailment of a juvenile's liberty, the juvenile is entitled to: (1) adequate notice, in advance, of the nature of the charge; (2) the advice of counsel as to both the preparation and presentation of the defense; (3) the privilege against self-incrimination, and (4) the right to confront his accusers. *In re Gault, supra.* And though we have no direct ruling on the applicability of *Miranda*[2] to juvenile proceedings, our Supreme Court has held that confessions obtained under circumstances which are unfair or unreasonable or are the product of fear of fatigue should not be used against a juvenile accused. *State in the Interest of Carlo,* 48 *N. J.* 224 (1966).

The thrust of recent decisions is toward protection of the juvenile, in areas where penal sanctions may be imposed, in a manner similar to the protection afforded adults in criminal proceedings. The policy basis of those rulings registers concern that espousal of and reliance on the *parens patriae* doctrine could, in individual situations, result in arbitrary action lacking fundamental fairness through which the power of the State is brought to bear upon an individual with the consequence of incarceration. As I see it, the objective is

---

[2] *Miranda v. Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed 2d* 694 (1966).

not to question the philosophy of juvenile jurisdiction or to hamper the rehabilitative and protective action of the juvenile court. Rather, it is to insure that juveniles receive fair treatment and are not handled as second-class citizens, under the guise of social benevolence. Thus, the courts have sought to insure that a juvenile is afforded certain of the procedural safeguards inherent in due process and available to adults, such as counsel, adequate notice and the like. Similarly, the courts have sought to protect a juvenile from state action bearing upon the question of whether an offense has been committed and of whether its detection and proof was fairly accomplished without invasion of individual rights. This area includes matters such as entrapment, coerced confessions, search and seizure, and wire tapping. All of these procedural and substantive matters properly bear upon the adjudicative phase of juvenile proceedings.

The "defense" of insanity does not fall within those areas of constitutional concern over individual rights. It is a special type of defense which concedes that an act has been committed, properly detected and properly established. This is certainly the case here. The accused juvenile, 15 years of age, did perform the physical acts which resulted in the violent deaths of two children. Moreover, the propriety of the methods used in detecting and proving these facts are not questioned.

The defense of insanity, then, as applied in adult proceedings, reflects a social policy that offenders lacking mental capacity in law to commit a criminal act for which penal consequences — including death or life imprisonment — could otherwise be imposed, should not be held legally, morally or socially accountable for their acts. The focus is thus not upon the commission of the act itself but upon the penal consequences of it.[3]

---

[3] In this context, it might be suggested that "capacity," mental or otherwise, is not an issue in juvenile proceedings because the Legislature has deemed children of the age of 15 or younger "in-

The intent, policy and purpose of *M'Naghten,* as it bears upon the issue posed here, succinctly frames the difference between criminal and juvenile proceedings and emphasizes the purpose and effect of an adjudication in juvenile court. An adjudication of juvenile delinquency is not completely the same as a conviction, a finding of guilt, in criminal proceedings. Both determinations must be arrived at fairly upon proper proof. But conviction on an indictment brings the deterrent and punitive, as well as the rehabilitative aspects of criminal process, into play.

An adjudicication on a juvenile complaint triggers the authority of the juvenile court to utilize the powers it has consistent with the proclaimed protective and rehabilitative interests of the tribunal. After adjudication *N. J. S.* 2A :4– 37 authorizes the use of broad powers to provide for treatment and rehabilitation of juvenile offenders.[4] Unlike the adult criminal courts, the juvenile court may make use of any public or private facility or institution appropriate and available under the circumstances. This includes private residential school placement, public or private mental hospitals, public and private institutions, and facilities for the training of the mentally retarded and the emotionally and

---

capable" of committing a crime. *State v. Monahan,* 15 *N. J.* 34 (1954) ; *N. J. S.* 2A :85–4. From a technical standpoint, the argument would be accurate.. But, in reality, it has but specious appeal and begs the question. The constitutional posture of recent decisions looks beyond declarations to practical and legal effects and consequences. If insanity under *M'Naghten* could lead to exculpation for an adult but fail to foreclose penal incarceration for a juvenile, a substantial injustice to individual rights and liberty would result.

[4] This section of the Juvenile Court Act provides the alternatives for disposition. Although an adjudication of delinquency is not expressly mentioned as a prerequisite to the authority provided the court, no other interpretation is acceptable. Any attempt to invoke the power of the court to impose the statutory dispositions enumerated in this section "for proper cause," short of an adjudication of delinquency, would violate the constitutional guaranty of individual freedom, due process and fundamental fairness. And the words "juvenile offender" in the title of the section must have been intended to apply to adjudicated delinquents.

physically handicapped. If anti-social acts are committed by children as a result of emotional disturbances, mental retardation or deficiency, or defect of reason due to mental disease, the court is charged by statute with providing the proper treatment, rehabilitative measures or therapy. This cannot be accomplished without first determining that the jurisdictional basis for judicial intervention exists — that is, that the offense was committed.

The adjudicatory phase, fairly undertaken, is thus the touchstone of the whole juvenile process. Absent adjudication, the court cannot act to exercise its *parens patriae* role to aid a juvenile offender. The inquiry is and must be, "Was the act committed?" To hold insanity applicable as a defense to adjudication would handcuff the court, run contrary to the basic theory of juvenile proceedings, and not be in the best interests of the juvenile himself.

Counsel for the juvenile calls attention to the decision of the Wisconsin Supreme Court upholding insanity as a defense to a charge of juvenile delinquency. *In re Winburn*, 32 *Wis. 2d* 152, 145 *N. W. 2d* 178 (1966). That court reasoned that irrespective of the good intentions of the juvenile court, its procedures "smack" of "crime and punishment"; some juveniles are removed from the community because they may harm fellow citizens, and juveniles fear incarceration and punishment, not rehabilitation. Also, juvenile delinquency is a term of opprobrium and therefore penal in nature. Presumably, reasons that court, the consequences of juvenile delinquency are serious enough to warrant the same "protection" offered to adult offenders, including the absolute defense of insanity. The fact that the state sought to prove delinquency "in the face of a strong defense of insanity" hardly "squares with the original benevolent, *parens patriae,* concept of the juvenile law," according to the court in Wisconsin, which declared Winburn insane and committed him to a state hospital[5].

---

5. There is no statutory authority in New Jersey for commitment to a mental hospital except under the civil commitment procedure, unless

I do not find the *Winburn* rationale applicable to proceedings in this court under the Juvenile Court Act of this State. In my view, if an adjudication of delinquency, even in the face of proof of insanity,[6] could lead to treatment and other rehabilitative measures, the result would, in the opinion of this court, promote the best interests of the juvenile and favorably reflect the fundamental concept of the juvenile court.

### III

This is not to suggest that an "insanity defense" has no bearing in juvenile proceedings. Indeed, the discussion leads logically to the conclusion that it must impose a limitation upon the dispositionary aspect of juvenile matters. Again, the ruling is simply that insanity is no defense to adjudication. But I also hold that a juvenile who has been adjudicated delinquent based upon an anti-social act committed while insane under the *M'Naghten* rule cannot be subjected to penal sanctions. Applying the concept of *Gault* to this situation can lead to no other conclusion. If an adult may avoid penal sanctions — *i. e.,* incarceration in prison or reformatory because of mental disease — a child with the same affliction cannot be treated more harshly because he is a juvenile. This accords with the purpose and effect of *Gault* and with the social policy inherent in the

there has been an adjudication of delinquency. *N. J. S.* 2A: 163-3, which authorizes commitment of an adult acquitted by reason of insanity, applies only to indictable offenses and is not applicable in juvenile causes.

6 *Winburn* is concerned about the "social stigma" an adjudication of delinquency carries with it: "This court can take judicial notice that in common parlance 'juvenile delinquent' is a term of opprobrium and it is not society's accolade bestowed on the successfully rehabilitated." The Wisconsin juvenile court had dismissed the petition, declared the juvenile "insane" and committed him to the state hospital. We question whether *Winburn* was in reality less stigmatized by the label "insane" which the court placed upon him then he would have been as a juvenile delinquent.

original philosophy of the juvenile court movement; it promotes and protects the juvenile's best interests, and it permits the juvenile court to function as intended. Under such an approach juvenile authorities are in a position to provide for the child not the "worst of both worlds," as feared by the U. S. Supreme Court in *Kent v. United States,* 383 *U. S.* 541, 86 *S. Ct.* 1045, 16 *L. Ed. 2d* 84 (1966), but some of the best of both worlds — from the one "the protection accorded adults" in that if a child is legally insane under M'Naghten no penal sanctions may be imposed; at the same time, from the other he may receive "the solicitous care and regenerative treatment postulated for children" in the exercise of the court's authority to use any available treatment and rehabilitative facilities for a juvenile "offender."

## IV

 Turning, then, to the disposition of the instant case, psychiatric testimony, particularly that of the defense psychiatrists, as well as the Menlo Park report, compel the conclusion that a residential treatment facility is essential for H. C.[7]

Dr. Markowitz referred to the need for "a long term continuing psychotherapeutic and residential process." Dr. Friedland concurred in this need.

This court is often called upon to provide the use of public facilities for care and treatment of juvenile delinquents, and has used and may use in this case such private resources as may be attainable through the use of any available public and private funds. The express provisions of the statute and the general philosphy of Juvenile Court

---

[7] Menlo Park's recommendation of a Yardville commitment because patients are at times discharged prematurely by mental hospitals must be rejected for the reasons stated in III above and because such commitment would, in any event, not be in H. C.'s interests.

Act in this State impose this as a mandatory obligation upon this court.

I have requested the prosecutor and counsel for the juvenile for assistance in the effort to explore all available public and private residential treatment facilities to which the juvenile may be committed. I have also instructed the Juvenile Division of the Morris County Probation Department to conduct an independent investigation. They will report to the court on any recommendations submitted and on the institutions mentioned by the psychiatrists at the original hearing, as well as the availability of funds for private placement should such a facility be available and appropriate.

The juvenile will be adjudicated delinquent. Pending review of the probation report and the availability of other proper facilities, he will be committed to Greystone Park State Hospital for psychiatric treatment. Jurisdiction is expressly retained, and the juvenile may not be discharged except by order of this court. Periodic reports will be required from the hospital concerning the boy's condition. The court, on its own motion or upon application of counsel or the boy's parents, will review the matter and consider any other placement or other disposition if, as and when circumstances may dictate.