IN the INTEREST OF B.M.:

B.M., Appellant,

V.

STATE of Wisconsin, Respondent.

Supreme Court

*No. 80–975. Argued March 2, 1981.—Decided March 31, 1981.*

(Also reported in 303 N.W.2d 601.)

For the appellant there was a brief (in court of appeals) by *Kenneth Guy*, assistant state public defender, and oral argument by *Steven P. Weiss*, assistant state public defender.

For the respondent there was a brief (in court of appeals) by *Peter Cannon*, of West Bend, assistant district attorney for Washington county, and oral argument by *Mr. Cannon* and *Sally L. Wellman*, assistant attorney general.

Amicus curiae brief was filed (in this court) by *John Franz*, of Madison, for Youth Policy and Law Center, Inc.

DAY, J. This is an appeal, on certification from the court of appeals, pursuant to sec. 808.05(2), Stats. 1979–80, and Rule 809.61, from the order of the Circuit Court for Washington County, Juvenile Division, adjudging the appellant (B.M.), to be delinquent and transferring his custody to the Wisconsin Department of Health and Social Services, Department of Corrections, (the department).

The principal question on appeal is: Is it error for a trial court to find a child adjudged delinquent to be a "danger to the public" when he presents no actual or potential threat of physical harm to another person? Stated another way: May a child adjudged delinquent be found to be a "danger to the public" on a showing that he presents an actual or potential threat to the property of another? We conclude that a delinquent child who presents a threat to the property of another may, in a proper case, be found a "danger to the public."

The second question is: Did the trial court err in not ordering a disposition that was less restrictive of the rights of the child and which assured his care, treatment or rehabilitation? We conclude that the court considered and rejected less restrictive dispositions and find no error on that ground.

The final question is: Did the disposition ordered by the trial court constitute an abuse of discretion? We find no abuse of discretion and affirm the order.

On March 20, 1980, a petition for determination of the status of B.M., a minor, was filed by the assistant district attorney for Washington county. The petition alleged that B.M. was delinquent because he had committed two counts of forgery-uttering, contrary to sec. 943.38(1)(a) and (2), Stats. 1979–80, on March 18 and March 19, 1980.

On March 20, 1980, the trial court entered an order placing B.M. in temporary nonsecure custody in his parents' home. The order further required B.M. to abide by the rules of the department and of his parents' home and that he not consume any alcoholic beverages or violate any laws.

On March 27, 1980, a plea hearing on the March 20 petition was held, in which B.M. admitted to the charges in the petition. The court entered an order on that date, designating the R.O.A.D.[1] program at the Winnebago Mental Health Institute for nonsecure custody pending disposition of the matter. No objection was made to this placement.

A detention hearing was held on April 9, 1980, upon the request of the Washington County Department of Social Services by social worker Kathleen Kazda. She stated at that hearing that B.M. was using drugs and not cooperating with the R.O.A.D. treatment program and that the program had requested he be removed from the program. The court then ordered B.M. held in secure detention in the Washington county jail pending a disposi-

---

[1] The R.O.A.D. Program ("Reflections of a Dream") is a treatment center for "Boys and girls ages 14 to 18 who have had contact with social services agencies, court and law enforcement agencies for delinquent acts which involve chemical abuse." YOUTH POLICY AND LAW CENTER, WISCONSIN JUVENILE COURT PRACTICE 405, (1978).

tional hearing on April 27, 1980, and ordered a psychological examination of B.M.

At the April 22, 1980, dispositional hearing, the facts of the forgery-uttering incidents were read into the record. B.M.'s counsel acknowledged examination of the report of the psychologist and the social worker. B.M.'s parents were present in court.

After hearing arguments of counsel, the court found that B.M.'s admissions to the forgery-uttering allegations were freely, voluntarily and intelligently entered, and based on those offenses found him to be a delinquent child. As a disposition of the matter the court ordered that appellant be committed to the department of corrections for a period not to exceed one year, designating the Ethan Allen School for Boys in Wales as the reception area.[2]

---

[2] The court noted its concern about certain of B.M.'s attitudes expressed by him to the examining psychologist. These included statements that B.M. could get out of school simply by refusing to go, that he could not control his use of drugs and that he hopes some day to get to the point where he just uses drugs on weekends and will be able to work during the week.

The court also observed that B.M. had been in at least two types of residential treatment centers, a psychiatric hospital and the R.O.A.D. program, but did not cooperate and was discharged from both.

The court also noted on the record that B.M. was previously placed under supervision for a burglary.

The court concluded:

". . . Various treatment programs, short of some sort of correctional type behavior, have all been tried. This young man has refused to cooperate with any of the programs, has violated by his admission the rules of supervision, rules of the home, violated the rules in that he didn't cooperate with the program, at the Milwaukee Psychiatric Hospital, didn't cooperate with the program, the R.O.A.D. program at Winnebago, that there isn't any appropriate voluntary program left for this Court or its officers to engage in.

"I think some form of secure detention is necessary. I am taking into account—I know of no residential program that will

On May 27, 1980, B.M.'s counsel filed a notice of appeal from the trial court's order. On December 4, 1980, the court of appeals, by order, consolidated this case with another and on December 19, 1980, certified the consolidated appeals to this court.[3] The court, in its certification, stated that both cases raised the question of whether the Children's Code, specifically sec. 48.34(4m), Stats. 1979–80, prohibits making a restrictive custodial placement "unless the juvenile has been found to present a threat of physical harm or injury to the public." This court accepted certification of the appeals on January 12, 1981.

The Children's Code, chapter 48 of the Wisconsin Statutes, was substantially revised by ch. 354, Laws of 1977. Among the changes made, was a redrafting of sec. 48.34, Stats., concerning the disposition of juvenile cases. That section now provides, in relevant part, that:

"**48.34. Disposition of child adjudged delinquent.** If the judge adjudges a child delinquent, he or she shall enter an order deciding one or more of the dispositions of the case as provided in this section under a care and treatment plan, except that subs. (4m) and (8) shall be exclusive dispositions: . . .

---

at this point accept someone who has had the past record that he has in terms of noncooperation, particularly in the R.O.A.D. program at Winnebago involving the use of drugs and alcohol there, particularly drugs. He just won't be accepted by a residential treatment center.

"I can't see that at this point, given the attitude he has expressed to Dr. Hockett, given the cavalier attitude he has expressed toward his rules and supervision in the past, that there presently has been any kind of significant change that would lead this Court to any reasonable assurance in his behavior, any substantial change in his behavior, if he were released back into the community under some form of supervision."

[3] On January 30, 1981, this court dismissed the other case on appeal, *In the Interest of A.A.J.: A.A.J. v. State*, No. 80–974, pursuant to the appellant's voluntary dismissal.

"(4m) Transfer legal custody to the subunit of the department administering corrections for placement in a secured correctional facility, but only if:

"(a) The child has been found to be delinquent for the commission of an act which if committed by an adult would be punishable by a sentence of 6 months or more; and

"(b) The child has been found to be a danger to the public and to be in need of restrictive custodial treatment."

B.M. was found to be delinquent for the commission of acts which if committed by an adult would constitute the crime of forgery-uttering, contrary to sec. 943.38(1). That offense is a Class C felony if committed by an adult and would be punishable by a sentence up to ten years. Sec. 939.50, Stats. 1979–80. Therefore, this requirement of sec. 48.34(4m)(a) was clearly met.

The meaning of the requirement of sec. 48.34(4m)(b), that the child be found to be "a danger to the public" is central to this appeal.

B.M.'s counsel first argues that the trial court erred in finding B.M. a "danger to the public" because the record does not show that he presented an actual or potential threat of physical harm to any person.[4]

---

[4] The trial court did not explicitly find B.M. a "danger to the public." That finding, however, was implicit in the court's dispositional order. *Miles Homes v. Starrett*, 23 Wis.2d 356, 359, 127 N.W.2d 243 (1964).

B.M.'s counsel argued to the trial court before the disposition "that the statute requires a finding that [B.M.] is a danger to the public." In determining the disposition the court observed that:

"I do note that three of the offenses which he has been under supervision for and the present two offenses are crimes against property and are not crimes of violence against persons. There are, however, felonies involved in three cases and they are major crimes against property. The public is entitled to be protected against them. It is their right to be secure in their property, to be secure against those who do commit crimes against property."

Sec. 990.01 (1), Stats. 1979–80, provides:

"All words and phrases shall be construed according to common and approved usage; but technical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning."

The common and approved meaning of a word can be established by reference to a recognized dictionary. *Milwaukee County v. ILHR Dept.*, 80 Wis.2d 445, 450, 259 N.W.2d 118 (1977).

Webster's Third New International Dictionary defines "danger" as:

"the state of being exposed to harm, liability to injury, pain or loss. . ."

"Danger to the public," then, refers to a person who exposes the public to harm, injury, pain or loss.

B.M.'s counsel contends that the term danger to the public "is limited, except in the most exceptional circumstances, to threats of harm to persons."

We do not agree. While the terms "injury" and "pain" are ordinarily limited to physical harm, "loss" is defined in terms of property. The primary definition of "loss" found in *Webster's, supra,* is:

". . . the act or fact of losing: failure to keep possession: DEPRIVATION (precautions against loss or theft of property.)"

There is nothing in the language of ch. 48 that demands a different construction than the plain meaning of the statutory language.

That the legislature did not intend to limit the meaning of "danger to the public" to persons threatening physical violence or injury is also supported by its use of that term in other sections of the statutes.

---

In his brief, B. M.'s counsel concedes that the court implicitly found B.M. to be a danger to the public and requested this court to proceed on the merits.

"Harmony and consistency are positive values in a legal system by reason of serving the interests of impartiality and minimizing arbitrariness. The practice of construing statutes by reference to other statutes is based upon the sound public policy of advancing those values." Sands, 2A *Sutherland On Statutes And Statutory Construction*, §53.01 (4th ed. (1973)).

For example, sec. 346.45(4), Stats. 1979–80, concerning marking of vehicles carrying hazardous materials, refers to "materials which are potentially *dangerous to life and property.*" (Emphasis added.) Likewise, sec. 114.04, Stats. 1979–80, concerning aircraft, refers to flights "so conducted as to be imminently *dangerous* or damaging *to persons or property.* . . ." (Emphasis added.) Sec. 31.-19, Stats. 1979–80, concerning dams, refers to *"danger to persons or property."* (Emphasis added.)

Reference in those statutes to danger to property strongly supports the idea that the legislature did not understand the meaning of "danger" to be limited in the way B.M.'s counsel suggests.

The court is also persuaded by federal court decisions construing 18 U.S.C. §3148. That section permits persons charged with capital offenses or convicted of other federal offenses to be released pending sentencing or review:

"Unless the court or judge has reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a *danger* to any other person or *to the community.*" 18 U.S.C. §3148, (Emphasis added.)

This language is so similar to that contained in sec. 48.34(4m), Stats., that judicial construction of the italicized language of that section provides persuasive authority on the meaning of danger to the public.

In *United States v. Parr,* 399 F. Supp. 883 (W.D. Tex. 1975), the court held that defendant who was convicted of perjury and removed from judicial office for misap-

propriation of public funds, was a danger to the community. The court denied release after conviction stating that:

"The 'danger . . . to the community' provision of 18 U.S.C. §3148 permits consideration of the defendant's propensity to commit crime generally, even where only pecuniary and not physical, harm might result to the community at large." *Parr, supra,* 399 F. Supp. at 888.

Similarly, in *United States v. Provenzano,* 605 F.2d 85 (3rd Cir. 1979), the court observed that:

"The Bail Reform Act specifies neither the kinds of harm nor the particular factors to be considered in determining whether a defendant poses a danger to the community. The trial judge's study of decisions interpreting the Act's 'danger to . . . the community' provision, however, convinces him that courts are not confined in such cases to considering only harms involving an aura of violence. *We agree and hold that a defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute a sufficient risk of danger to come within the contemplation of the Act."* *Provenzano, supra,* ʰ05 F.2d at 95. *See also:* Annot. 26 ALR Fed 970, 1976 ("Bail—Danger To Community"). (Emphasis added.)

We agree with those courts and conclude that the language of sec. 48.34(4m), Stats., does not preclude a finding that a delinquent child is a danger to the public, merely because he presents ˌa threat only to property rather than a physical threat to persons.

If the argument of B.M.'s counsel were accepted by this court, no juvenile could be placed in a secure custodial placement with the department for any crime against property regardless of the seriousness of the threatened loss or the needs of the minor. B.M.'s counsel responds to this concern by pointing out that a delinquent minor sixteen years of age or over may be transferred to adult

court and be prosecuted under the Criminal Code, pursuant to sec. 48.18, Stats. This approach would afford the public no protection against any minor under the age of sixteen who poses a serious threat to property. Nor is it necessarily in the best interest of a minor over sixteen to be waived into adult court and branded with a criminal record.

If the legislature had intended to so limit the disposition of cases involving a delinquent minor who poses a danger to property, it could have used language designed to accomplish that end.[5] But we are constrained to construe the statute, not as it might have been written but as it was written.

We hold that a juvenile who presents a threat to the property of others may in proper circumstances be found to be a danger to the public and that the trial court did not err in finding B.M. to be a danger to the public.

B.M. next argues that the trial court erred by not ordering a disposition that was the least restrictive of his rights and which assured his care, treatment or rehabilitation.

Sec. 48.355 (1), Stats. 1979–80, provides that:

"48.355. **Dispositional orders.** (1) INTENT. In any order under s. 48.34 or 48.345 the judge shall decide on a placement and treatment finding based on evidence submitted to the judge. The disposition shall employ those means necessary to maintain and protect the child's wellbeing which are the least restrictive of the rights of the parent or child and which assure the care, treatment or rehabilitation of the child and the family. Wherever possible the family unit shall be preserved and there shall be a policy of transferring custody from the parent only where there is no less drastic alternative."

B.M.'s counsel argues that the court failed to thoroughly explore less restrictive alternative dispositions.

---

[5] For example, see the detailed language employed in sec. 51.20 (2), Stats. 1979–80.

The trial court's disposition was based on the evidence submitted to him. This evidence included a psychological report showing that B.M. had a drug problem which he could not control and expressing serious concern about his attitudes toward drugs and school. The court noted that B.M. had previously been placed in two treatment centers but had violated program rules and had been discharged from both. The court noted that B.M. had admitted to three serious crimes against property, including a burglary. The court rejected the alternative of residential treatment because it knew of no residential treatment program that would accept him.

We believe this record shows the trial court considered less restrictive alternatives and rejected them consistent with sec. 48.355(1), Stats. We affirm the statement made in *In re Interest of J. K.*, 68 Wis.2d 426, 434, 228 N.W.2d 713 (1975) that:

"While the selection of any one alternative [disposition] does involve and require the rejection of others, less or more onerous, as comparatively inappropriate, we do not see a juvenile judge as required to climb such stairway one step at a time."

The record shows that the judge considered and rejected less restrictive dispositions and we find no error on that ground.

Finally, the contention is made that the disposition constituted an abuse of discretion, given the policy considerations of Chapter 48.

". . . where discretion is conferred upon a trial court, the appellate court is not to reverse the trial court unless the record demonstrates that there has been an abuse of discretion." *In re Johnson*, 9 Wis.2d 65, 75, 100 N.W.2d 383 (1960).

Sec. 48.01(1), Stats. 1979–80, sets out the purposes behind the Children's Code. The first among those purposes is:

"To provide judicial and other procedures through which children and all other interested parties are assured fair hearings and their constitutional and other legal rights are recognized and enforced, *while protecting public safety.*" (Emphasis added.) Sec. 48.01(1)(a), Stats. 1979–80.

Sec. 48.01(2), Stats. 1979–80, provides that:

"(2) This chapter shall be liberally construed to effect the objectives contained in this section. The best interests of the child shall always be of paramount consideration, but *the court shall also consider* the interest of the parents or guardian of the child and *the interests of the public.*" (Emphasis added.)

In *Winburn v. State,* 32 Wis.2d 152, 145 N.W.2d 178 (1966), this court discussed the purpose and philosophy behind the Children's Code then in force which included a provision substantially identical to that quoted next above. The court observed that:

"While the primary statutory goal is the best interest of the child, that interest is, as it should be, conditioned by the consideration of 'the interest of the public.' Sec. 48.01(3), Stats. The interest of the public is served not only by rehabilitating juveniles when that is possible, but the interest of the public is also served by removing some juveniles from environments where they are likely to harm their fellow citizens." *Winburn, supra,* 32 Wis.2d at 161.

In *In re Interest Of J. K.,* 68 Wis.2d 426, 435, 228 N.W.2d 713 (1975), this court acknowledged the necessity in juvenile court proceedings of balancing the interests of the child with the interests of the public. This court concluded that:

"In balancing the paramount interest of the minor and the interests of parents and public, in selecting the disposition that is most appropriate in a particular case, in considering each case on its individual merits, in weighing the factual considerations involved and the weight to be accorded them, we find it '. . . essential that the juvenile court judge exercise judicial discretion in conformance with the mandate of the provisions of ch. 48, and as it has been construed by this court.' " *In re Interest of J. K., supra,* 68 Wis.2d at 435–436. (Quoting *In re Interest of F. R. W.,* 61 Wis.2d 193, 209, 212 N.W.2d 130 (1973).)

The record shows that balancing was fairly and properly done by the trial court in this case and we find no abuse of discretion.

*By the Court.*—Order affirmed.