STATE of Wisconsin, Plaintiff-Respondent,

v.

Sameeh J. PICKENS, Defendant-Appellant.

Court of Appeals

*No. 2008AP1514–CR. Submitted on briefs March 6, 2009.
—Decided December 23, 2009.*

2010 WI App 5

(Also reported in 779 N.W.2d 1.)

226

228

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Eileen A. Hirsch*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sarah K. Larson*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Dykman, P.J., Lundsten and Higginbotham, JJ.

¶ 1. LUNDSTEN, J. Sameeh Pickens was detained outside a hotel because the police suspected that he and others were involved in illegal drug activity at the hotel. The police obtained incriminating evidence from Pickens and from a hotel room in which Pickens was apparently staying. Pickens moved to suppress this evidence, arguing that his detention was illegal and that the evidence was obtained as a result of the illegal detention. The circuit court disagreed and denied the motion. Pickens entered pleas and was convicted of two counts of possession of cocaine with intent to deliver as party to a crime. On appeal, Pickens challenges the suppression rulings.

¶ 2. The interaction of law and facts in this case is complicated. For now, it must suffice to say that we will address the following questions:

> (1) In determining whether there is reasonable suspicion for an investigative detention, may a court consider that officers have knowledge of the bare fact that a person is suspected by other officers of prior criminal behavior?

> (2) Assuming that the police had sufficient information to initiate a brief investigative detention, did police illegally detain Pickens when he was handcuffed and secured in the back of a squad car while police continued their investigation in the hotel?

> (3) Should evidence found in the hotel room where

231

Pickens was apparently staying, and in a safe within the room, be suppressed because the person who consented to the search of the room—an occupant who said she was staying in the room with Pickens—did not have apparent authority with respect to the room or the safe?

(4) If the occupant lacked apparent authority, with respect to either the room or the safe, was evidence found in either of those locations admissible under the inevitable discovery doctrine?

¶ 3. Our answers to these questions lead us to reverse the judgment, affirm the order in part and reverse it in part, and remand with directions to suppress the evidence obtained from Pickens and from the safe inside the hotel room, but not the evidence found in the room apart from the safe.

## *Background*

¶ 4. On the morning of August 4, 2003, Madison police were conducting an investigation at the Select Inn hotel. Initially, the investigation centered on whether a room was acquired by fraud, but, as the investigation progressed, police learned additional facts suggesting illegal drug activity.

¶ 5. An officer found a man sleeping in a car in the hotel parking lot. The man identified himself as Pickens. The officer had seen a flier in a police briefing area stating that Pickens was a suspect in a shooting incident. After the officer questioned Pickens for a short time, the officer placed Pickens in handcuffs and secured him in the back of a squad car while the officer returned to investigate inside the hotel.

¶ 6. During the ensuing investigation, police located suspects in Room 220 and one of these suspects said he had rented another room—which police deter-

232

mined was Room 216—for Pickens. After Pickens had spent about forty minutes in the back of the squad, an officer asked if Pickens would consent to a search of his person. He did, and the search yielded over $1,700 in cash and what were later determined to be keys to Room 216 and to a safe in that room.

¶ 7. The police went to Room 216 and knocked. The door was answered by a lone occupant named Bryana Clark. Clark consented to a search of the room, which yielded drugs and drug paraphernalia on top of and inside a dresser. Using one of the keys they had taken from Pickens, the police unlocked the safe in the room and found cocaine base and heroin.

### Discussion

¶ 8. At the time police detained Pickens, they knew that he was suspected by other officers of being involved in a shooting on a prior occasion, but there was no testimony at the suppression hearing about facts supporting that suspicion. The parties dispute whether we may consider the officers' knowledge of the bare fact that Pickens was suspected by other officers of being involved in a prior shooting.

¶ 9. The shooting information matters because it is the primary basis on which the State justifies the decision to not simply detain Pickens, but to secure him in handcuffs in the back of a squad car. As we shall see, the legality of this level of intrusiveness turns on whether the police had reason to believe that Pickens was dangerous. The prosecutor needed to do more than show that police were entitled to temporarily detain Pickens; the prosecutor needed to show the police were justified in taking these extra measures to restrain him. The legality of this detention, in turn, matters because it led to some of the evidence Pickens seeks to suppress.

¶ 10. Thus, we begin by resolving the dispute over what information we may consider. We then determine the reasonableness of Pickens' detention. After that, we address the propriety of the searches of the hotel room and the safe in that room.

### 1. The Bare Fact That Investigating Officers Knew That Other Officers Suspected Pickens Was Involved In A Prior Shooting

¶ 11. Pickens does not dispute that reasonable suspicion is assessed by looking at the collective knowledge of police officers.[1] But he does argue that, in the absence of underlying facts, the mere knowledge of the suspicion of other officers is not the sort of information courts may consider in determining whether the reasonable suspicion standard is met. We agree.

¶ 12. Our analysis focuses, as it must, on the information presented to the court and not on the undeniable fact that police officers often properly act on the basis of the knowledge of other officers without knowing the underlying facts. For example, under the collective knowledge doctrine, an investigating officer with knowledge of facts amounting to reasonable suspicion may direct a second officer without such knowledge to stop and detain a suspect. *See Tangwall v.*

---

[1] *See State v. Alexander*, 2005 WI App 231, ¶ 13, 287 Wis. 2d 645, 706 N.W.2d 191 (" 'Under the collective knowledge doctrine, there are situations in which the information in the hands of an entire police department may be imputed to officers on the scene to help establish reasonable suspicion or probable cause.' " (quoting *State v. Orta*, 2000 WI 4, ¶ 20, 231 Wis. 2d 782, 604 N.W.2d 543 (Prosser, J., concurring))).

*Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) (where arresting officer does not personally know the facts, an arrest is proper if the knowledge of the officer directing the arrest, or the collective knowledge of police, is sufficient to constitute probable cause).

■

¶ 13. At the same time, in a collective knowledge situation, if a defendant moves to suppress, the prosecutor must prove the collective knowledge that supports the stop. Proof is not supplied by the mere testimony of one officer that he relied on the unspecified knowledge of another officer. Such testimony provides no basis for the court to assess the validity of the police suspicion—it contains no specific, articulable facts to which the court can apply the reasonable suspicion standard. This conclusion flows from the following law.

■■

¶ 14. The State bears the burden of proving that a temporary detention was reasonable. *Florida v. Royer*, 460 U.S. 491, 500 (1983); *State v. Quartana*, 213 Wis. 2d 440, 445, 570 N.W.2d 618 (Ct. App. 1997). Such a detention requires a reasonable suspicion, grounded in "specific and articulable facts," and reasonable inferences from those facts, that an individual was engaging in illegal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also State v. Waldner*, 206 Wis. 2d 51, 56, 556 N.W.2d 681 (1996). The *Terry* Court explained that courts need the underlying articulable facts in order to perform their neutral oversight function:

> [I]n justifying the particular intrusion [at a suppression hearing] the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably

warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge . . . .

*Terry*, 392 U.S. at 21 (footnote omitted); *see also Johnson v. United States*, 333 U.S. 10, 13–14 (1948) (the protection of the Fourth Amendment consists of requiring that facts and reasonable inferences from those facts "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime").

¶ 15. Reliance on non-specific information from other officers was addressed in *United States v. Hensley*, 469 U.S. 221 (1985). There, as here, officers relied on information from a police flier or bulletin, and the Court addressed the proper approach to assessing whether reasonable suspicion justifies a stop in that situation:

> [I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. If the flyer has been issued in the absence of a reasonable suspicion, then a stop . . . violates the Fourth Amendment . . . . [W]e hold that the evidence uncovered in the course of the stop is admissible *if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop,* and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

*Id.* at 232–33 (emphasis added; citations omitted).

236

¶ 16. We glean from *Terry, Johnson,* and *Hensley* that, when a court assesses the reasonableness of a temporary detention, it may not consider the bare fact that investigating officers know that other officers suspect an individual of involvement in prior criminal behavior because such evidence does not provide specific, articulable facts to which the court can apply the reasonable suspicion standard.

¶ 17. As should be clear by now, we do not hold that police officers must have personal knowledge of all the facts needed to support a seizure before acting. Rather, our focus is on what comes later—proof at a suppression hearing. As to the suppression hearing in this case, we do not know what the prosecutor could have presented to show that it was reasonable to suspect that Pickens was involved in a prior shooting; we only know that the prosecutor did not present such evidence. Accordingly, we conclude that our reasonable suspicion determination may not include consideration of the investigating officers' bare knowledge that other officers suspected that Pickens was involved in a prior shooting.[2]

### 2. Legality Of Pickens' Detention

¶ 18. Having concluded that we may not consider the bare suspicion that Pickens was involved in a prior

---

[2] For ease of discussion, we have focused our attention on the suspicion that Pickens was involved in a prior shooting. But our analysis also applies to testimony that Pickens was "pretty much a known name" to everyone in the police department and to suspicions of prior activity involving other suspects here, including Clifford Robinson. The testimony on these topics similarly lacks underlying facts that would permit neutral judicial oversight.

237

shooting, we consider the remaining evidence to assess whether it supports Pickens' detention.

### a. Facts Supporting
### A Temporary Investigative Detention

¶ 19. On the morning of Pickens' detention, sometime before 7:30 a.m., police were dispatched to a hotel to investigate a complaint that a woman had tried to rent a room using only a credit card number. The hotel staff thought this was suspicious. A second dispatch alerted police that the female suspect was believed to have gone to a different hotel, the Select Inn.

¶ 20. When police arrived at the Select Inn, the hotel clerk informed them that she received a call that morning, from the other hotel, warning her to be on the lookout for a short, "stocky" black female with corn rows in her hair who was attempting to obtain a room by fraud. The clerk told police a woman fitting this description had just rented a room. The woman identified herself to the clerk using the name Stephanie Weix and using a credit card number on a piece of paper. The credit card in her possession was so beat up or worn that the numbers on it were not readable. The woman was given Room 220. She was alone when she rented the room, but a short time later was seen with a white male.

¶ 21. The police proceeded to Room 220 and knocked on the door. A black male answered and identified himself as Clifford Robinson. He told police that he had paid $50 for the room to "Stephanie" at 4:30 a.m. Notably, this time was about two hours before the woman using that name rented the room at approximately 6:30 a.m. Three other individuals were in Room 220, a black male and two white females. Thus, neither

the black female who rented the room nor the white male she had been seen with were present in the room.

¶ 22. Officer O'Shea, whose experience included two and one-half years with a narcotics and gang task force and special drug-crime-related training, testified that drug users sometimes rent motel rooms without staying in them, allowing their dealers to operate out of the room for a while before moving on to another motel. Another experienced officer testified that often people will rent rooms for other people to engage in illegal activities, including drug activity.

¶ 23. All four occupants of Room 220 claimed to have no vehicle at the hotel. Officer O'Shea checked the hotel parking lot and found a man sleeping in a car. O'Shea made contact, and the man identified himself as Pickens. Pickens claimed he was staying in Room 220.

¶ 24. Suspecting illegal drug activity in Room 220, Officer O'Shea asked Pickens to step out of the car, and Pickens complied. Pickens declined a request to search the car. Apart from what we have summarized, Officer O'Shea did not see any evidence of illegal activity. The officer testified that he saw no evidence of weapons and did not observe Pickens make any sudden movements.

¶ 25. After Pickens declined the request to search his car, Officer O'Shea handcuffed Pickens and placed him in the back of a squad car while O'Shea returned to the interior of the hotel to continue his investigation.

### b. Whether Reasonable Suspicion Justified Pickens' Detention

¶ 26. Pickens argues that police lacked reasonable suspicion even to briefly detain him in the hotel parking lot. We need not resolve this question because, assum-

ing without deciding that reasonable suspicion justified a temporary investigative detention, the detention became unreasonable when Pickens was handcuffed and secured in the back of a squad car.

¶ 27. When a temporary detention is justified, we still examine the circumstances of the detention to determine whether "the investigative means used in the continued seizure are 'the least intrusive means reasonably available to verify or dispel the officer's suspicion' " and whether it lasted " 'no longer than is necessary to effectuate the purpose of the stop.' " *State v. Arias*, 2008 WI 84, ¶ 32, 311 Wis. 2d 358, 752 N.W.2d 748 (quoting *Royer*, 460 U.S. at 500); *see also United States v. Novak*, 870 F.2d 1345, 1352 (7th Cir. 1989) ("To qualify as a mere *Terry* stop, a detention must be limited in scope and executed through the least restrictive means.").

¶ 28. Pickens argues that both the intrusive level of restraint the police imposed and the duration of his detention were unreasonable. He points to United States Supreme Court language stating that "police [may not] seek to verify their suspicions by means that approach the conditions of arrest." *Royer*, 460 U.S. at 499.

¶ 29. For the reasons that follow, we agree with Pickens that the level of restraint imposed on him was unreasonable. Accordingly, we need not address Pickens' argument that the duration of the detention was also unreasonable.

¶ 30. The State argues that handcuffing and securing Pickens in the back of a squad was reasonable based on safety concerns arising from knowledge that Pickens was a suspect in a prior shooting. It is at this juncture that our conclusion that we may not consider the bare fact that Pickens was a suspect in a prior

240

shooting becomes significant. When this information is removed from consideration, there are no other specific, articulable facts indicating that Pickens was armed or otherwise dangerous. As we have stated, the officer who handcuffed Pickens testified that he saw no evidence that any weapons were present and that Pickens did not make any sudden movements.[3] And, the State points to no other facts justifying the use of handcuffs. *See Womack v. United States*, 673 A.2d 603, 624 (D.C. 1996) ("[C]ourts have recognized that the use of handcuffs substantially increases the intrusiveness of a *Terry* stop and must be independently justified.").

¶ 31. Notably, the State does not develop an argument that the suspicion of illegal drug activity alone justified handcuffing Pickens. In the absence of full briefing, we choose not to decide the issue. We note, however, that our research indicates that we would likely reject such an argument. Although courts have frequently observed that illegal drugs and weapons go hand in hand,[4] reasonable suspicion of drug activity is not, by itself, generally a sufficient indicator of dangerousness to justify the level of restraint police imposed on Pickens. *See United States v. Acosta-Colon*, 157 F.3d 9, 19 (1st Cir. 1998) (generalized reasonable suspicion related to drug trafficking not enough to establish that handcuffing was reasonably measured response to actual safety concerns); *United States v. Melendez-Garcia*, 28

---

[3] The testimony does not indicate whether Pickens was or was not frisked for weapons before being handcuffed. An officer testified he did not frisk Pickens before securing him in the squad car.

[4] *See, e.g., State v. Guy*, 172 Wis. 2d 86, 98, 492 N.W.2d 311 (1992); *State v. Richardson*, 156 Wis. 2d 128, 144, 456 N.W.2d 830 (1990).

241

F.3d 1046, 1052–53 (10th Cir. 1994) (acknowledging that "[d]rugs and guns and violence often go together," but concluding that "the naked fact that drugs are suspected will not support a per se justification for use of . . . handcuffs in a *Terry* stop").

¶ 32. The use of handcuffs or other restrictive measures does not necessarily render a temporary detention unreasonable, nor does it necessarily convert that detention into an arrest. *See State v. Vorburger,* 2002 WI 105, ¶ 64, 255 Wis. 2d 537, 648 N.W.2d 829. However, as we have explained, such measures generally are reasonable only when particular facts justify the measure for officer safety or similar concerns. *See* 4 WAYNE R. LAFAVE, SEARCH & SEIZURE § 9.2(d), at 310–13 (4th ed. 2004).

¶ 33. In sum, we conclude that the State failed to show that the level of restraint used to detain Pickens was reasonable because the State points to no specific, articulable facts that justify handcuffing and securing Pickens in a squad car. In the absence of any other developed argument supporting admission of evidence obtained from Pickens in the parking lot, we conclude that that evidence must be suppressed.[5]

[5] A number of courts have concluded that police exceeded the permissible scope of a temporary detention in circumstances that we find at least as compelling as those here. *See United States v. Richardson,* 949 F.2d 851, 856–58 (6th Cir. 1991) (suspect was approached by four police officers, informed he was the subject of a drug investigation, and briefly questioned; after he would not consent to a search, the valid stop became unlawful when police proceeded to secure him in back of police car and continue questioning); *United States v. Neatherlin,* 66 F. Supp. 2d 1157, 1162 (D. Mont. 1999) (when officer had reasonable suspicion of illegal border crossing and made stop in remote area in the middle of the night, there were reasonable concerns for officer

¶ 34. In the next sections, we turn our attention to the State's argument that the evidence discovered in Room 216 and in the safe in that room was untainted by Pickens' detention and was admissible based on theories of consent and inevitable discovery.

### 3. Consent For The Search Of
### Room 216 And The Safe In That Room

¶ 35. After illegally detaining Pickens and obtaining evidence from him, the police searched Room 216 and a safe in that room. Pickens challenges both the search of the room generally, and the interior of the safe. We first recount the pertinent facts and then address the parties' arguments.

¶ 36. Independent of evidence obtained from Pickens, the police learned that one of the suspects they located in Room 220, Clifford Robinson, had rented Room 216. Robinson told police he rented the room for his friend, Pickens. Robinson declined to consent to a search of Room 216, instead saying that a search was up to whomever was in the room.

---

safety, but handcuffing suspect and placing him in officer's vehicle nonetheless exceeded the boundaries of investigatory detention), *aff'd*, 243 F.3d 551 (9th Cir. 2000) (Nos. 00–30007 and 00–30020); *Cocke v. State*, 889 So. 2d 132, 133–35 (Fla. Dist. Ct. App. 2004) (leaving suspect in handcuffs and placing him in squad car for thirty to forty-five minutes transformed stop into *de facto* arrest when police had found no weapons after conducting pat down, suspect did not resist or act belligerent, and officer expressed no other reason to be concerned for safety); *State v. Pannell*, 901 P.2d 1321, 1325–26 (Idaho 1995) (even when there was "some evidence" that suspect "might have posed a threat to the officers' safety," handcuffing suspect and placing him in patrol car exceeded level of force justified for an investigatory detention when pat down revealed no weapons and suspect was fully compliant at all times).

¶ 37. When police went to Room 216, a woman named Bryana Clark opened the door wearing only a sheet and appearing sleepy. She told police that she was staying in the room with Pickens. After Clark dressed and returned to the door, an officer asked her consent to search the room and she gave it. Police found cocaine, marijuana, and other evidence on and inside a dresser. Using the safe key they had taken from Pickens, they unlocked the safe in the room and discovered that it contained cocaine base, heroin, and at least one document containing a reference to Pickens.

### a. Whether Pickens' Detention Led Police To Room 216

¶ 38. Pickens asserts that the keys found in his pocket after his illegal detention "led police to Room 216" and, therefore, all of the evidence found in the room must be suppressed as a fruit of that illegal detention. He does not, however, back up this assertion with a developed argument. On the contrary, Pickens concedes that police attention would have focused on Room 216 anyway because information from Clifford Robinson led police to that room. Thus, it cannot be seriously argued that evidence obtained from Pickens affected whether the police would have gone to Room 216 to continue their investigation.

### b. Clark's Authority Over Room 216

¶ 39. An individual with actual or apparent common authority over premises may consent to their search. *State v. Tomlinson*, 2002 WI 91, ¶ 25, 254 Wis. 2d 502, 648 N.W.2d 367. Common authority to

consent to a search is based on whether there is " 'mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right.' " *State v. Kieffer*, 217 Wis. 2d 531, 542, 577 N.W.2d 352 (1998) (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). Even if actual authority is lacking, there may be apparent authority when "the information available to the police officers at the time of the search would justify a reasonable belief that the party consenting to the search had the authority to do so." *Id.* at 548.

¶ 40. Pickens characterizes Clark's status as that of an "overnight guest" or "casual visitor." Because Clark appeared to be a guest, Pickens argues, she did not have apparent authority over the room. We disagree.

¶ 41. As recounted above, when police went to Room 216, Clark said she was staying in the room with Pickens. She appeared to have been sleeping and she needed to get dressed. It is true that police had determined that Robinson gave Pickens permission to stay in Room 216, but the police also knew that Pickens had been found sleeping in a car outside the hotel. Thus, so far as police knew, both Pickens and Clark, like many hotel guests, were temporary occupants. This fact distinguishes the situation from cases Pickens relies on involving guests at more permanent residences. *See Illinois v. Rodriguez*, 497 U.S. 177, 179–81 (1990); *United States v. Harris*, 534 F.2d 95, 96–97 (7th Cir. 1976); *Kieffer*, 217 Wis. 2d at 534–38; *People v. Wagner*, 304 N.W.2d 517, 519–20 (Mich. Ct. App. 1981).

¶ 42. Pickens argues that the police should have doubted Clark's authority over the room, in part, because police found the room key and a safe key for Room 216 in Pickens' pocket. Our review of the record suggests it is

unclear when police first became aware that the keys they found on Pickens were for Room 216. Even assuming, however, that police knew Pickens had keys to Room 216 by the time they discovered Clark in the room, police could have reasonably believed that Clark shared authority over the room.

¶ 43. We need not address whether Clark had actual authority over Room 216 because we conclude that she had apparent authority over the room. It follows that the circuit court properly declined to suppress drug evidence found on and in the dresser.

### c. Clark's Authority Over The Safe

¶ 44. We turn our attention to the evidence found in the room safe. Pickens contends, and the circuit court agreed, that, even if Clark had apparent authority over the room, she did not have actual or apparent authority over the inside of the safe. The room safe was locked and, according to fact finding by the circuit court, Clark could not open the safe and did not even know it was in the room. Moreover, the State does not point to evidence that the police could have reasonably thought otherwise.

¶ 45. Lacking a viable argument that Clark had actual or apparent authority over the interior of the safe, the State frames the question as whether Clark's consent to the room search extended to the safe. In other words, the State sees the question as whether police would have reasonably understood Clark's consent to search the room to include consent to search the interior of the safe. The State points to case law holding that consent to search an area generally implies consent to search containers within that area, at least in the context of an automobile search and at least when

246

the containers could contain the object of the search. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *State v. Matejka*, 2001 WI 5, ¶¶ 39–41, 241 Wis. 2d 52, 621 N.W.2d 891; *see also United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000) (involving a motel room).

¶ 46. We reject the State's approach. If we could skip past whether Clark had actual or apparent authority, and resolve the propriety of the search based on the area to which her consent applied, then her connections to the safe would not matter. If the only issue was the scope of consent then, indeed, police could rely on anyone's consent, so long as that consent covered the safe. Thus, the threshold question must be the scope of Clark's *authority,* not the scope of her *consent. See United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("The key to consent is actual or apparent authority over the area to be searched.").

¶ 47. Because the State has not shown that Clark had actual or apparent authority over the safe in Room 216, the State cannot rely on Clark's consent to search as a valid basis for admitting the evidence police found inside the safe.

### 4. Inevitable Discovery

¶ 48. Although the circuit court correctly concluded that Clark did not have actual or apparent authority over the safe, the court erred when it admitted the evidence from the safe under the inevitable discovery doctrine.

¶ 49. The State's inevitable discovery argument is simple: because, by the time police illegally searched the safe, they had enough information to obtain a search warrant for the safe, it follows that the police

would have inevitably acquired a warrant and legally obtained the contents of the safe. The State does not, however, explain how its theory satisfies the requirement that police be actively pursuing the legal alternative—here, a warrant—prior to the unlawful search. *See State v. Lopez*, 207 Wis. 2d 413, 427–28, 559 N.W.2d 264 (Ct. App. 1996) (the inevitable discovery doctrine includes the requirement that "prior to the unlawful search the government . . . was actively pursuing some alternate line of investigation"). If the existence of probable cause for a warrant excused the failure to obtain a warrant, the protection afforded by the warrant requirement would be much diminished. *See United States v. Cherry*, 759 F.2d 1196, 1205–06 (5th Cir. 1985) (explaining that application of the inevitable discovery doctrine, where agents "could have obtained a warrant but had made no effort to do so," undercuts the warrant requirement).

¶ 50. Because we see nothing in the record to support the view that police were actively pursuing an alternative legal means of opening the safe, we reject the State's inevitable discovery argument and direct that the evidence found in the safe be suppressed.

### Conclusion

¶ 51. For the above reasons, we reverse the judgment, affirm the order in part and reverse it in part, and remand with directions to suppress the evidence obtained from Pickens and from the safe inside the hotel room, but not the evidence found in the room apart from the safe.

*By the Court.*—Judgment reversed; order affirmed in part, reversed in part and cause remanded with directions.