Brennan, J.[1]
¶ 1 J.P. appeals the trial court's denial of his suppression motion as well as the court's entry of a restitution order for lost instructional time.
¶ 2 With regard to the suppression motion, J.P. argues on appeal that there was no probable cause for his arrest or the seizure of his phone, and that because he alone had the authority to give consent, his mother's consent was without lawful authority and accordingly the resultant search of his phone was unlawful. Additionally, he argues his confession was involuntary.
¶ 3 With regard to the restitution order, J.P. argues that the court lacked authority to enter an award for lost instructional time under the juvenile restitution statute, WIS. STAT. § 938.34(5) and the order must be vacated.
¶ 4 We conclude that the denial of J.P.'s suppression motion was proper because probable cause existed for J.P.'s arrest and the seizure of the phone. We conclude that his mother's consent to search the phone provided a lawful basis for the search because she had actual authority to consent and her consent was not involuntary. We conclude that J.P.'s confession was voluntary. But we reverse the trial court's entry of a restitution order for lost instructional time because although the adult restitution statute explicitly authorizes such restitution, the juvenile restitution statute does not.
BACKGROUND
Four Bomb Threats
¶ 5 On January 25, 2015,[2] a written bomb threat appeared on the boys' bathroom wall at West Allis Central High School saying something like "there's a bomb in the school, and everyone will die." Surveillance cameras showed that students went in and out of that bathroom during the day, but the first student to report the threat was J.P. The cameras showed that the next student to use the bathroom also reported the bomb threat. No charges were issued that year.
¶ 6 On February 4, 2016, the school received a phoned-in threat from a male with an unknown caller ID saying that there was a bomb in the school and "everyone will die." The West Allis police officer assigned to the school, Sergeant Nicole Moews, noticed that the threat used the same words as the one from the previous year: "everyone will die." Moews testified that the school's video footage revealed J.P. was in a school bathroom when this bomb threat was made.
¶ 7 Moews further testified that one month later, on March 7, 2016, at 9:31 a.m., the school received another phoned-in bomb threat, and video footage showed J.P. was in the hall, going into or out of one of the bathrooms at the time of the threat. There are no cameras inside of the bathrooms. The students were evacuated from the school as a result of this threat. No bomb was discovered.
¶ 8 The next day, on March 8, 2016, at 9:45 a.m., the school secretary answered a call from a male who said, "There are bombs in the lockers." She described the caller's voice as that of a younger African-American. She reported the call to police and the school was again evacuated.
¶ 9 Detective Eric Sturino investigated the March 8 incident and testified at trial that the principal told him that the school's IT staff had identified the caller's number because it came in unblocked and had a 622 prefix. The call on March 7 had also been determined to be from a 622 prefix. Sturino had tried to call the number but received a message that the caller was unavailable. At the time of the March 8 bomb threat, school surveillance cameras again showed that J.P. had entered the boys' bathroom where there are no cameras. Sturino was informed that based on the investigation into the IP address, the March 8 call came from within the school.
¶ 10 Moews testified that two girls came up to her on March 7, 2016, during the bomb threat evacuation and reported that they had received a text message during the March 7 bomb threat evacuation, saying, "You know, I'm watching you, you've been warned." The text message was signed with the letter "A." The girls told Moews that this message was similar to messages on the television show "Pretty Little Liars" where a group of girls torments other girls with messages that are signed with a capital "A." Then Moews testified that as she conducted her investigation on March 8, she observed J.P. talking to the two girls who had reported the odd text message on their phones during the March 7 incident. She thought it odd when on the day after the suspicious text messages, J.P. was talking to these two girls when she had never see him talk to them before. She reported her observations to Sturino.
¶ 11 Moews testified that Sturino told her on March 9 to bring J.P. to the station so that he could talk to him about the threats. She went to the school and had the hallway administrator escort J.P. to the office. It is school policy that students being escorted to the office are not to be allowed on their phone. Typically the hallway administrator puts the phone in the student's backpack or carries it to the office. The hallway administrator in this instance handed Moews the phone. Moews then put it in J.P.'s backpack.
¶ 12 Moews told J.P. that she needed him to come to the police station because of the suspicious text messages during the bomb threat. She told him he was not under arrest and did not put him in handcuffs. She was in uniform. She testified that he came voluntarily. She drove him in her squad, he sat in the back seat, and she turned him and his backpack over to Sturino.
Seizure of the phone and arrest of J.P.
¶ 13 After J.P. had spoken to Moews about the investigation, Sturino placed J.P.'s phone on police inventory, gave him his Miranda[3] warnings, and commenced a seventeen-minute interview with him and with Detective Darlene Wink also present. The interview took place at the West Allis police station interview room. The door was shut, J.P. was not handcuffed, and the detectives were dressed in plain clothes. Sturino testified that he probably had his weapon on him in a side holster but was seated during the interview. At that time, J.P. was sixteen years old and in the tenth grade. Sturino testified that J.P. was not under arrest, was free to go, said he understood his rights, and did not ask for an attorney.
¶ 14 Sturino showed J.P. the still photographs showing J.P.'s presence near the bathrooms during the bomb threats on March 7 and 8. J.P. denied his involvement in the bomb threats. He gave Sturino his cell phone number, but he refused to consent to a search of the phone. Sturino drove J.P. back to school, but because there had been another bomb threat, the school had been evacuated to a church, and Sturino dropped J.P. off there.
¶ 15 Afterwards, Sturino received a message that J.P.'s mother[4] had called the station and was angry because she felt the police were picking on her son. He returned her call and explained to her that he had talked to her son because of the investigation into the school bomb threats. He explained that he had not fingerprinted or photographed her son. J.P.'s mother wanted to talk to him in person and came to the station on March 9 with another woman and J.P.
¶ 16 Sturino met with them in the conference room at the station, not an interview room. J.P.'s mother said the phone was hers and she wanted it back immediately. Sturino explained that he had seized it and was intending to apply for a search warrant for it. She asked if she could get it back faster by consenting to a search of it. He explained that his technical support staff would have to hook it up to a machine and he would call her when it was ready. She signed the consent form on March 9, 2016, and provided the name of the service provider. J.P. supplied the password for the phone after his mother told him to. The consent form included the cell phone number and stated:
I ... hereby give consent to the West Allis Police Department or its agents/officers to search my cell phone for phone numbers, text messages, photographs and other contents.... Carrier, Sprint. Make/Model number, Apple I phone. Password 3295. I hereby give consent to search and fully understand that by consenting I will be given no consideration for immunity, promises or any other consideration.
Then J. P., his mother and the other woman left the station.
¶ 17 After they left, the police saw that the phone had a TextNow app. After using the password, the police saw that the phone quickly reset to the factory setting, which Sturino referred to as being "wiped remotely." So When contacted again, J.P.'s mother provided the iCloud password and log-on for the phone's account. With that information, the phone reset itself to the last date it was backed up, which was March 4. The TextNow app was no longer on the phone. Police tech support staff were able to determine that the phone was used to access the school's Wi-Fi system at the time of the two bomb threats on March 7 and 8.
J.P.'s arrest and interview on March 10, 2016
¶ 18 On March 10, J.P. was formally arrested, given his Miranda warnings, and then interviewed. He confessed to the March 7 and 8 bomb threats.
The Delinquency Petition and Procedure
¶ 19 The State filed a delinquency petition on March 14, 2016, charging two counts of bomb scares, a violation of WIS. STAT. § 947.015, based on the March 7 and 8, 2016 phoned-in bomb threats. J.P. filed a motion to suppress, challenging: (1) the probable cause to arrest him and seize the cell phone; (2) the third-party consent to search his phone; and (3) the voluntariness of his custodial statement. The trial court denied the motion. J.P. entered an admission to the petition and the court adjudicated him delinquent of both counts. At the dispositional hearing on November 28, 2016, the trial court ordered that J.P. be placed under supervision by the Milwaukee County Department of Human Services for one year, expiring November 28, 2017.[5]
¶ 20 A restitution hearing was held approximately two months later and the trial court found that the school district's losses amounted to $18,363.78. However, the court found that J.P. had the ability to pay only $3000.00 and on January 26, 2017, entered a restitution order in that amount.
¶ 21 J.P. appeals from the dispositional order of November 28, 2016, and the revised dispositional order dated January 26, 2017.
DISCUSSION
I. The police had probable cause to arrest J.P. and to seize the cell phone used by J.P.
¶ 22 We review the trial court's suppression motion decision under a mixed standard. The trial court's factual findings are accepted unless clearly erroneous. WIS. STAT. § 805.17(2). Application of the constitutional principles of search and arrest to the facts are questions we review independently of the conclusions of the trial court. State v. Secrist , 224 Wis. 2d 201, 208, 589 N.W.2d 387 (1999).
¶ 23 The suppression motion below challenged the arrest of J.P., the seizure of the phone he used, the authority to consent to the search of the phone, and the voluntariness of J.P.'s confession. We address the arrest and phone seizure first. The arrest of J.P. and a seizure of the phone he used occurred at the same time but are generally subject to different legal analyses. The standard for probable cause to arrest is set forth in Secrist :
Probable cause to arrest is the quantum of evidence within the arresting officer's knowledge at the time of the arrest which would lead a reasonable police officer to believe that the defendant probably committed or was committing a crime. ("A law enforcement officer may arrest a person when ... [t]here are reasonable grounds to believe that the person is committing or has committed a crime."). There must be more than a possibility or suspicion that the defendant committed an offense, but the evidence need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not. Whether probable cause exists in a particular case must be judged by the facts of that case.
Id. at 212 (citations omitted).
¶ 24 The test for determining whether probable cause exists for seizure of evidence is different. "Although our legal lexicon often presents 'searches and seizures' as an inseparable tandem, the two are constitutionally and analytically distinct.... A seizure differs from a search, as it 'deprives the individual of dominion over his or her person or property.' " State v. Arias , 2008 WI 84, ¶ 25, 311 Wis. 2d 358, 752 N.W.2d 748 (citation omitted). "A search invades different constitutionally protected interests-the privacy interests of a person." State v. Kramer , 2009 WI 14, ¶ 40 n.10, 315 Wis. 2d 414, 759 N.W.2d 598.
¶ 25 Although the probable cause standards differ for arrest and seizure, we apply the probable cause for arrest standard here because both the arrest and seizure occurred at the same time. We, like the trial court, find that probable cause existed for the arrest. Because the higher probable cause for arrest standard is satisfied here, it follows that the lower standard for seizure of the phone is satisfied as well. The quantum of proof necessary for probable cause to search is whether a person in the position of the police here would reasonably believe that the item to be searched probably contains evidence of a crime. See Secrist , 224 Wis. 2d at 209, 212. The test is reasonableness, not reasonable doubt, and not a mere suspicion. Id. "The question of probable cause must be assessed on a case-by-case basis, looking at the totality of the circumstances. Probable cause is a 'flexible, common-sense measure of the plausibility of particular conclusions about human behavior.' " State v. Lange , 2009 WI 49, ¶ 20, 317 Wis. 2d 383, 766 N.W.2d 551 (citation omitted).
¶ 26 We agree with the trial court that J.P. was arrested on March 9, 2016, when, at the request of police, he was brought to the school office and had his phone seized.[6] On March 9, when the hallway administrator removed J.P. from his class and escorted him to the school office, the hallway administrator took his phone and backpack, which was part of the school's regular procedure. When they arrived at the school office, Moews took the backpack and phone from the hallway administrator. Moews then took J.P. to the police station in a marked squad, seated in the back seat. At the station, Moews turned the phone over to Sturino. As the trial court stated, "[A]ny reasonable person in that situation would feel that they were under arrest." The court noted that this was the point of arrest even though J.P. was not handcuffed and even though the police did not subjectively intend to arrest him at that time because those factors were not controlling.
¶ 27 At the time of the arrest and seizure, the record shows, the West Allis police were aware of the following factors, which are not disputed:
• There was a written bomb threat in the boys' bathroom on January 25, 2015, with the words, "everyone will die." Although the cameras showed students going into and out of that bathroom during the day on January 25, J.P. was the first to report the threat and the student who entered next reported it as well. No one before J.P. reported it.
• Similar words were repeated in the February 4, 2016, phoned-in bomb threat-"everyone will die"-and J.P. was seen entering the bathroom shortly before that time.
• There were phoned-in bomb threats on March 7 and 8, 2016, and J.P. was seen going into bathrooms on both dates around the time the bomb threats were called in.
• The caller sounded like a young African American male, which fit J.P.'s description.
• The police were aware that the bomb threat calls were placed from inside of the school by use of a TextNow app and from the same phone number with a 622 prefix.
• There were cameras throughout the school and not in the bathrooms, and this allowed a person to place the threats from within the bathroom without being observed by camera.
• During the March 7 school evacuation over the bomb threat, two females approached Moews to report receiving what they described as "suspicious" text messages during the evacuation that mimicked the television show "Pretty Little Liars" and were from an unknown source. Both said something along the lines of "You know, I'm watching you, you've been warned." And both were signed "A." Relatedly, Moews testified that during the evacuation for the March 8 bomb threat she observed J.P. talking to the same two females which she thought was unusual because as school liaison officer she was aware that she had never seen J.P. in contact with those two before.
¶ 28 Based on the foregoing facts, we conclude that there was sufficient evidence in the possession of the West Allis police on March 9 before the arrest and seizure to suggest to a reasonable person that it is probable that J.P. committed the bomb threats on March 7 and 8 and that his phone would likely contain evidence regarding the commission of that crime. See Secrist , 224 Wis. 2d at 209, 212.
¶ 29 Contrary to J.P.'s argument, this evidence creates more than a possibility that J.P. was the caller. His location in the bathroom-where no cameras can record, at the precise moment that three bomb threats were made in the space of approximately one month-is substantial evidence, even without more. Accordingly, the totality of the evidence here shows that the police had ample probable cause both for his arrest and the seizure of the phone.
II. J.P.'s mother had actual and apparent authority to consent to the search of the cell phone.
¶ 30 Consent is a well-known exception to the Fourth Amendment warrant requirement. State v. Phillips , 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998). "The State has the burden of proving consent by clear and convincing evidence." State v. Tomlinson , 2002 WI 91, ¶ 21, 254 Wis. 2d 502, 648 N.W.2d 367 (citations omitted). A person who consents to a search must have actual or apparent authority. See State v. Pickens , 2010 WI App 5, ¶ 39, 323 Wis. 2d 226, 779 N.W.2d 1. Apparent authority exists where there is not actual authority, but the information available to the officers at the time of the search "would justify a reasonable belief that the party consenting to the search had the authority to do so." Id. (citation omitted). See also Illinois v. Rodriguez , 497 U.S. 177, 188 (1990).
¶ 31 J.P. argues here that he alone had a reasonable expectation of privacy in his phone despite the fact that his mother purchased the phone and paid the phone bills. He relies on the six factors in State v. Trecroci , 2001 WI App 126, ¶ 36, 246 Wis. 2d 261, 630 N.W.2d 555,[7] and admits it is his burden to show: (1) that he had an actual, subjective expectation of privacy in the area searched and item seized; and, (2) that society is willing to recognize his expectation of privacy as reasonable. Id.
¶ 32 We conclude that J.P. fails in his burden on both prongs. First, he fails to show the first factor of Trecroci , that he has a property interest in the phone. It is undisputed that his mother purchased it and pays for the service to Sprint. J.P. is sixteen years old and a high school sophomore living at home. His mother told police that it was her phone and signed the consent form to that effect. We conclude that J.P.'s mother owns the phone and has the property interest in it.
¶ 33 Second, the record conclusively shows that J.P. failed to exercise complete dominion and control over the phone. Although he alone knew the password to the phone, when his mother told him on two occasions to turn over the password, he acquiesced each time without a protest. It is apparent that he accepted her control of the phone.
¶ 34 With regard to the second prong of the Trecroci analysis, J.P. fails to offer any evidence that society would recognize his expectation of privacy. He is a sixteen-year-old minor whose mother purchased and controlled use of the phone. He cites cases for the general principle that children have due process and constitutional rights, but none reach anywhere near the facts here.[8]
¶ 35 J.P. argues that he controlled the phone because he alone used it and he alone knew the passwords. However, these two factors do not show control. Control is better demonstrated by the fact that as soon as his mother told him to, J.P. relinquished the passwords. J.P.'s mother clearly controlled the phone.
¶ 36 Alternatively, even if the foregoing facts are insufficient to show by clear and convincing evidence that J.P.'s mother actually had authority to consent, they more than amply demonstrate that the police's reliance on her clearly articulated claim of ownership and granting of consent is reasonable. See Pickens , 323 Wis. 2d 226, ¶ 39.
¶ 37 J.P. additionally argues that his mother's consent to search the phone was not voluntary. He offers little factual support for this claim. He contends that because she was "upset" and believed that the consent form she signed was conditional, her consent was not voluntary. The record is devoid of any support for a claim that police coerced her consent or any legal authority for the argument that her "upset" state rendered her incompetent to give consent. The consent form is clear. On it, she admits that it is her phone, and she authorizes a search for phone numbers, text messages, and photographs, all without any conditions. Accordingly, we conclude that her consent was voluntary. See Tomlinson , 254 Wis. 2d 502, ¶ 21.
III. J.P.'s confession was voluntary.
¶ 38 Voluntariness is a question we review by giving deference to the factual findings of the trial court, however, we apply constitutional principles independently. See State v. Hoppe , 2003 WI 43, ¶ 34, 261 Wis. 2d 294, 661 N.W.2d 407. When we review a custodial statement for voluntariness, we evaluate whether the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist. Id. , ¶ 36. The State bears the burden of proof to a preponderance to show that the confession was not involuntary. Id. , ¶ 40.
¶ 39 The court in Hoppe described specific examples of the factors to look at both sides of the balancing test. "The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement." Id. , ¶ 39. The court explained that those are balanced against police tactics such as:
[T]he length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.
Id.
¶ 40 J.P. argues that his statement was involuntary because he was denied a phone call and because the police lied to him, using psychological pressure, to persuade him to confess. Additionally, he argues that his case is like that of State v. Jerrell C.J ., 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110, where the Wisconsin Supreme Court concluded that Jerrell's confession was involuntary. Id. , ¶ 36.
¶ 41 We note at the outset that the court in Jerrell adopted all of the language of the voluntariness analysis in Hoppe but added that the United States Supreme Court had spoken of the need to exercise "special cautions" when assessing the voluntariness of a juvenile confession, "particularly when there is prolonged or repeated questioning or when the interrogation occurs in the absence of a parent, lawyer, or other friendly adult." Jerrell , 283 Wis. 2d 145, ¶ 21 (citations omitted). So we proceed with the Hoppe analysis of J.P.'s personal characteristics as measured against police tactics here. In so doing, we see many distinguishing facts between Jerrell's and J.P.'s case that cause us to conclude that Jerrell does not support J.P.'s involuntariness argument.
¶ 42 Jerrell was much more vulnerable to pressure than J.P. Jerrell was fourteen years old and in the eighth grade. Jerrell , 283 Wis. 2d 145, ¶ 6. Jerrell was taken to the police station at 6:20 a.m., handcuffed to a wall, and left alone for approximately two hours. Id. , ¶¶ 5-6. He was questioned by detectives (one of whom said he "raised his voice" but didn't yell) from 9:10 a.m. until lunch time. Id. , ¶¶ 7-8. There was no audio or video recording requirement at the time of the interview. Id. , ¶ 59 After a twenty-minute lunch break, questioning resumed, and he confessed to the armed robbery. Id. , ¶¶ 9, 11. The detectives refused to give Jerrell an opportunity to call his mother or father even though he asked several times. Id. , ¶ 10. He signed a confession at 2:40 p.m., over five and a half hours after the interrogation began and eight hours after he was taken into custody. Id. , ¶ 11.
¶ 43 By contrast, J.P. was sixteen and one-half years old, just six months away from being an adult for criminal court jurisdiction purposes, and a sophomore in high school. He was "bright" and "intelligent" according to his mother. Regarding the first interview on March 9, where he made no inculpatory admission , he was interviewed for seventeen minutes at the station in a room with audio and video recording, not handcuffed, and not left alone. When the detective told him that he intended to get a search warrant for the phone, J.P. blurted out, "Can I get my phone call?" Two and a half minutes later, when he asked again, he was told he could use the phone. J.P. was then driven back to school by the police and not formally arrested or processed.
¶ 44 Another significant difference in J.P.'s case is his mother's involvement. She brought J.P. back to the police station on March 9-not at the request of police. She signed the consent to search form and told J.P. to provide the passwords. She and J.P. left the station on their own, knowing that the police were going to use the passwords to search the phone.
¶ 45 The next day, on March 10, the police formally arrested J.P. based on the information from that phone search[9] and then conducted the second interview, during which J.P. confessed. Again, there are substantial differences between J.P.'s and Jerrell's circumstances. First, J.P. confessed only seventeen minutes into the interview . His confession came after the police agreed to show J.P. the phone search evidence that they had uncovered, which showed in pertinent part that J.P.'s phone was used to access the school's Wi-Fi system at the time of the two bomb threats on March 7 and 8. Notably, during this second interview, he made no request for a phone call .
¶ 46 The record shows that police made no threats or promises to J.P. to coerce a confession. J.P. does not even claim that they did. J.P.'s entire coercion argument is based on three points: (1) that one of the officers was wearing a holstered gun; (2) that police lied when they told him that the girls who received text messages named him; and (3) that the police denied him a phone call.
¶ 47 As to the phone call, we have shown above that J.P. was given a phone call within three minutes of requesting one on March 9, where no inculpatory statement was made, and that he never requested one on March 10. As to the gun, the record shows one officer wore it holstered on March 9. There is no claim or evidence that it was referred to at all.
¶ 48 As to the alleged lie, J.P. bases this argument on his assertion that when the police told J.P. that the girls had said the text messages were from J.P., police were lying. However, J.P. does not show the statement was actually a lie. As the State correctly pointed out, the record shows only that Sergeant Moews was not given the information by the girls. But the questioner was Detective Sturino, and he could have been referring to information he or another officer obtained. So there is no evidence of a lie. Secondly, even if it was a lie, that does not make it an impermissible police tactic. The text messages had little to do with the evidence against J.P., and being accused of sending them was not directly problematic for J.P. And as for police tactics, persuasion and pressure are permitted generally. The issue is whether the pressure was greater than J.P.'s ability to resist. See Hoppe , 261 Wis. 2d 294, ¶ 36. Clearly, in this case the pressure was not greater because this occurred on March 9 when J.P. did resist police pressure and made no inculpatory statement.
¶ 49 Therefore, we conclude that the record shows, under the totality of the circumstances that J.P.'s statement on March 10, his only inculpatory statement, was voluntary. The State has met its burden.
IV. The trial court erred in construing the juvenile restitution statute, WIS. STAT. § 938.34(5), to authorize restitution for lost instructional time.
¶ 50 Questions of statutory interpretation are questions of law which we review de novo . State v. B.S. , 133 Wis. 2d 136, 138, 394 N.W.2d 750 (1986).
¶ 51 J.P. challenges only one part of the trial court's restitution order: the finding for restitution for lost instructional time. He argues that the juvenile restitution statute, WIS. STAT. § 938.34(5), does not permit an award of this type even though the adult restitution statute does. See WIS. STAT. § 973.30(5)(a). Accordingly, he asks that this court vacate that part of the restitution order for lost instructional time.
¶ 52 The State argues that we should affirm the restitution order because the lost instructional time is compensable under the juvenile restitution statute by analogy to the adult statute and under State v. Rouse , 2002 WI App 107, 254 Wis. 2d 761, 647 N.W.2d 286. In the alternative, the State asks us to "confirm" the order as to the other two parts, pointing out that J.P. challenged only the part of the restitution order that is attributable to the lost instructional time findings of the trial court.
¶ 53 There are no factual disputes on appeal as to the findings and order on lost instructional time. The trial court made specific findings on the four areas of restitution that the State had requested for the West Allis School District. The court found that the State had not proved the lost food category and declined any order for that. But the court found that the State had met its burden of proving three areas of loss for which restitution was appropriate: (1) lost instructional time in the amount of $17,776.80; (2) lost food service worker cost of $370.00; and (3) lost custodial worker cost of $216.98, for a total of $18,363.78. Next, the court found that J.P.'s ability to pay was $3000.00 and ordered him to pay restitution in that amount.
¶ 54 We first address the scope of J.P.'s restitution challenge. Despite the argument in his reply brief, J.P.'s opening brief clearly challenges only one part of the restitution order: the lost instructional time part. We note that J.P.'s opening brief states the issue this way: "Did the circuit court err in ordering the value of lost instructional time under the juvenile restitution statute as part of J.P.'s restitution obligation?" And he concludes his argument in both his opening and reply briefs by requesting that this court "vacate that portion of the restitution order for the value of the lost instructional time " (emphasis added).
¶ 55 Nonetheless, in response to the State's request in its brief that we "confirm" the restitution obligation on the two other parts of $370.00 and $216.98, J.P. argues in his reply brief, for the first time, that the State forfeited any such argument. We conclude that he misapplies forfeiture rules and that his argument runs counter to his own framing of his appellate issue as shown by the quotes from his brief. He did not claim or develop any argument for reversing these two parts of the restitution order. Therefore, they are not part of our reversal order. Likewise, he does not challenge the trial court's $3000.00 ability-to-pay order. Accordingly, we review only the lost instructional time part of the restitution order.
¶ 56 As to the merits of J.P.'s challenge to the lost instructional time part of the order, we agree with J.P. The juvenile restitution statute is much more limited than the adult statute. The juvenile restitution statute provides in pertinent part:
Subject to par. (c),[10 ] if the juvenile is found to have committed a delinquent act that resulted in damage to the property of another, or actual physical injury to another excluding pain and suffering, [the judge may] order the juvenile to repair the damage to property or to make reasonable restitution for the damage or injury, either in the form of cash payments or, if the victim agrees, the performance of services for the victim, or both, if the court, after taking into consideration the well-being and needs of the victim, considers it beneficial to the well-being and behavior of the juvenile.
WIS. STAT. § 938.34(5)(a). Thus, the juvenile statute authorizes the court to order payment of cash, or order that the juvenile repair the damage or make "reasonable restitution for the damage or injury[.]" But it does so only if the delinquent act resulted in damage to the property of another-as applicable here.
¶ 57 There is no Wisconsin case that has held that the juvenile statute includes payment for the value of time or even lost wages. There is such a case interpreting the adult restitution statute, Rouse , and that case was relied on by the trial court during its order. But the adult restitution statute differs substantially from the juvenile one, and Rouse is not support for the trial court's construction here.
¶ 58 The other flaw in the trial court's order of restitution for lost instructional time is that the juvenile statute permits restitution to the property owner. Here the trial court specifically said, and the State did also, that the loss of instructional time was the students' loss. So, even if lost time is property, it is the property of the students and not the school district. And because the restitution award went to the school district , and not the students, it is not permitted by the plain words of the statute, "property of another."
¶ 59 A careful contrasting of the adult restitution statute further illustrates the error of the order here. The adult restitution statute provides in pertinent part:
In any case, the restitution order may require that the defendant do one or more of the following:
(a) Pay all special damages, but not general damages, substantiated by evidence in the record, which could be recovered in a civil action against the defendant for his or her conduct in the commission of a crime considered at sentencing.
(b) Pay an amount equal to the income lost, and reasonable out-of-pocket expenses incurred, by the person against whom a crime considered at sentencing was committed resulting from the filing of charges or cooperating in the investigation and prosecution of the crime.
WIS. STAT. § 973.20(5)(a)-(b). The adult statute clearly authorizes: (1) special damages that could be recovered in a civil action; and (2) lost income and out-of-pocket expenses. That plain language stands in marked contrast to the juvenile restitution statute which permits reasonable restitution only for damage to property, as applied here.
¶ 60 The words of the statutes show that legislative intent is clearly different with regard to the juvenile statute. When construing statutory language we look first to the statute's plain language to determine the legislature's intent. State ex rel. Kalal v. Circuit Court for Dane Cty. , 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. The words of the juvenile statute are distinct in its limitation to "damage to property." It says nothing about special damages, lost income, or damages that could be recovered in a civil action. In fact, a Wisconsin case has held that it was error for the trial court to order restitution for a victim's lost wages under the juvenile statute. See B.S. , 133 Wis. 2d at 140. The juvenile statute is also unique in that it allows an order to the juvenile to actually do the repair him or herself. This comports with the children's code's well-established purpose of rehabilitating juveniles.[11] In B.S. , the court stated that "[t]he juvenile law is not to be administered as a criminal statute, and the rules of criminal procedure are not to be engrafted upon the Children's Code." Id. at 140 (citing Winburn v. State , 32 Wis. 2d 152, 157-58, 145 N.W.2d 178 (1966) ).
¶ 61 It is a well-recognized principle of statutory construction that we presume that the legislature purposefully chose the words it used and omitted the words it did not want. See Juneau Cty. v. Associated Bank, N.A. , 2013 WI App 29, ¶ 16, 346 Wis. 2d 264, 828 N.W.2d 262 ("When we interpret a statute, we begin with the statute's plain language, as we assume the legislature's intent is expressed in the words it used."). Here, the legislature certainly could have used the same language in the juvenile restitution statute that it did in the adult statute. But, at least up until now, it has not done so.
¶ 62 Rather than relying on the statute, the State argues that Rouse provides support for the lost instructional time order.[12] However, Rouse is completely distinguishable because it is an interpretation of the adult restitution statute and the State acknowledges that it does not provide precedential support.
¶ 63 Accordingly, we affirm the trial court's decision denying the suppression motion, and we reverse only that part of the court's order awarding restitution for "lost instructional time." All other parts of the restitution order are affirmed. We remand to the trial court for further proceedings consistent with this opinion.
By the Court. -Orders affirmed in part; reversed in part and cause remanded for further proceedings.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(e) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Respondent's brief states this first bomb threat written on the bathroom wall occurred in 2016. Appellant points out in his reply brief that this is an error and in fact the correct year is 2015. We agree based on our search of the record.

Miranda v. Arizona , 384 U.S. 436 (1966).

We refer to J.P.'s mother without providing further identifying information to protect J.P.'s identity.

The trial court imposed a secure detention portion to the original sentence but then revised the secure detention portion only in an order dated December 20, 2016, because of a petition filed by the Department. That order is not appealed.

In arguments to the trial court, the State had argued that J.P. was not arrested until March 10 and that the police did not subjectively intend to arrest him on March 9. On appeal, the State does not challenge the trial court's conclusion to the contrary.

This court in State v. Trecroci stated the six factors to be considered in order to determine whether society is willing to recognize a subjects expectation of privacy as reasonable, albeit in the context of search of a home: (1) whether the person had a property interest in the premises; (2) whether the person was legitimately on the premises; (3) whether the person had complete dominion and control and the right to exclude others; (4) whether the person took precautions customarily taken by those seeking privacy; (5) whether the person put the property to some private use; and (6) whether the claim of privacy is consistent with historical notions of privacy. Id. , 2001 WI App 126, ¶ 36, 246 Wis. 2d 261, 630 N.W.2d 555.

For example, he argues that a California case supports the principle that a father could not consent to opening the son's locked toolbox in his bedroom. See Fare v. Scott K. , 595 P.2d 105 (1979). But that case is factually distinguishable and not precedential in Wisconsin.

J.P. does not challenge the lawfulness of that search on appeal.

The parties agree that par. (c) of the statute has no bearing on this case.

See I.V. v. State , 109 Wis. 2d 407, 408, 326 N.W.2d 127 (Ct. App. 1982), which recognizes that restitution has been viewed as "a 'therapeutic' means of helping a boy" and a redress to victims.

As support for the other costs addressed by the restitution order-the extra costs of custodial or food service-the State cites I.V. , 109 Wis. 2d at 408. The State seems to recognize that I.V. provides no support for ordering restitution for lost instructional time because it does not rely on I.V. as support for that portion of the order.